[Cite as *Zapata Real Estate, L.L.C. v. Monty Realty, Ltd.*, 2014-Ohio-5550.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 101171**

**ZAPATA REAL ESTATE L.L.C.**

PLAINTIFF-APPELLEE

vs.

**MONTY REALTY LTD., ET AL.**

DEFENDANTS-APPELLANTS

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-12-789988

**BEFORE:** E.A. Gallagher, P.J., Kilbane, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** December 18, 2014

**ATTORNEYS FOR APPELLANTS**

Robert J. Dubyak
Anthony J. Trzaska
Dubyak Nelson L.L.C.
6501 Parkland Blvd., Suite 230
Cleveland, Ohio 44124

Craig W. Relman
James S. Schoen
Craig Relman Co., L.P.A.
23811 Chagrin Blvd., Suite 160
Cleveland, Ohio 44122

**ATTORNEYS FOR APPELLEES**

**For LNR Partner, L.L.C., et al**.

Bradley J. Barmen
Mannion & Gray Co., L.P.A.
1375 E. 9th St., Suite 1600
Cleveland, Ohio 44114

**For Cuyahoga County Treasurer**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Judith Miles
Assistant County Prosecutor
Justice Center, Courts Tower
1200 Ontario Street
Cleveland, Ohio 44113

**For Zapata Real Estate, L.L.C.**

Aaron H. Bulloff
Daniel P. Hinkel
Kevin M. Hinkel
Dean M. Rooney
Kadish, Hinkel & Weibel
1360 East 9th Street
Suite 400
Cleveland, Ohio 44114

EILEEN A. GALLAGHER, P.J.:

{¶1} In this dispute related to a foreclosure action, third-party plaintiffs-appellants Monty Realty, Ltd. ("Monty") and Florence A. Montgomery (collectively, "appellants") appeal from the decision of the trial court granting summary judgment in favor of third-party defendants-appellees LNR Partners, L.L.C. ("LNR") and Wells Fargo Bank, N.A., as trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006-C5 (the "Trust") (collectively, "appellees") on appellants' claims of promissory estoppel, breach of the duty of good faith and various other claims related to the Trust's allegedly improper retention of reserve funds. Appellants contend that genuine issues of material fact exist as to each of their claims and that the trial court, therefore, erred in granting summary judgment in appellees' favor. Finding no merit to the appeal, we affirm the trial court's judgment.

**Factual Background**

{¶2} On August 10, 2006, Monty executed a commercial promissory note (the "note") in favor of Column Financial, Inc. ("Column") in connection with a $3,000,000 loan it received from Column. The note was secured by an open-end mortgage and security agreement (the "mortgage") encumbering Cornerstone Plaza, a shopping center in North Olmsted, Ohio ("Cornerstone" or the "property"), an assignment of leases and rents and an indemnity and guaranty agreement executed by Florence Montgomery.[1] The note had an initial interest rate of 6.23% per annum and required Monty to make monthly principal and interest payments on or before the 11th day of each month, beginning September 11, 2009 and continuing through and

---

[1]The note, mortgage, assignment of rents and leases and indemnity and guaranty agreement executed by Florence Montgomery are collectively referred to as the "loan documents."

including September 11, 2016.[2]   In accordance with the loan documents, Monty was also required to make monthly payments of reserve funds for the payment of real estate taxes, tenant improvements and other items associated with Monty's ownership of the Cornerstone property.

{¶3}   In April 2008, Column assigned and transferred all of its rights and   interest in the loan documents to the Trust.   KeyCorp Real Estate Capital Markets, Inc. ("Key") was the master servicer for the Trust, responsible for the day-to-day servicing of loans that were current, and LNR served as the special servicer for the Trust, acting on behalf of the Trust to resolve nonperforming loans.

{¶4} Sometime in late 2010 — before Monty missed any loan payments — Mark Montgomery ("Montgomery"), Monty's "authorized representative,"[3] contacted LNR to inquire whether it would consider restructuring the loan.   Montgomery testified that he could not recall with whom he spoke, only that it was a "short phone call" and that he was "referred back to Key."   Monty had no further communications with LNR until the spring of 2012.

{¶5} In November 2011, Monty initiated discussions with Key regarding a possible modification of the loan.   Montgomery testified that, in early November 2011, he had a series of telephone conversations with Gail Smith ("Smith"), an account manager for Key, during which he inquired whether the loan could be modified.   He testified that Smith informed him that LNR

---

[2]Under the terms of the note, Monty was required to make monthly interest-only payments from September 11, 2006 through August 11, 2009.  On October 11, 2016, the maturity date, the entire outstanding principal balance of the note, together with all accrued but unpaid interest, was due and payable in full.

[3]It is unclear from the record what title or position Montgomery held with Monty or what his duties or responsibilities entailed.   In his affidavit submitted with appellants' brief in opposition to Key and LNR's original motion for summary   judgment, Montgomery describes himself simply as Monty's "authorized representative."   The limited excerpts from the transcript of his deposition that are included in the summary judgment materials do not clarify his role.

exclusively handled requests for loan modifications and that because the loan was current, Key could not transfer it to LNR. Montgomery testified that Smith told him Key could only transfer the loan to LNR if Monty was in default, i.e., that "that's just how they do it," but that she would contact LNR and discuss the matter with LNR. On November 9, 2011, Montgomery sent an email to Smith in which he explained the circumstances surrounding Monty's request for a loan modification and Monty's proposal to modify the loan, as follows:

> We spoke recently about the financial strains we are experiencing with the high vacancy and delinquent tenants. You suggested I explain the current situation with hopes that we could seek some relief on the terms of our mortgage.
>
> As you know, last year the center ended with a loss of $39[,]685, from net operations. This year we estimate the loss will grow to $45,000. We will not be able to continue making up the loss from other operations for much longer.
>
> Needless to say, the value of the commercial real estate market has been hard hit and CornerStone is no exception. It is not our intention to abandon the center but prefer to workout a mutually acceptable modification of the terms of our note.
>
> We are requesting the following modifications:
>
> 1. Reduction of the ceiling cap for TILC from $55,000. to the current escrow balance, estimate at $30,000. This would reduce the monthly payment by $916.67.
>
> 2. Reduction of interest rate from 6.23% to 4.0%.

{¶6} On November 11, 2011, Smith responded to Montgomery stating, in relevant part:

> I received a response from the Special Servicer [i.e., LNR] regarding your request. At this point, the Special Servicer is not recommending a transfer to them based on the current information provided to them. If you feel that future payments of this loan is in jeopardy due to your circumstances, I can recommend transfer for imminent default, but because you are current with your payments, the Special Servicer does not feel it necessary to transfer at this time.
>
> Please be advise[d] that a transfer to the Special Servicer **does not** guarantee that
>
> they will work with you at the terms you are requesting. If there is away [sic] you

can make it work under the current terms of the Note, it is advisable to continue to do so; however, if you foresee not be [sic] able to make the debt service payment due to the current circumstances, please let me know and I will recommend the transfer.

(Emphasis sic.)

{¶7} Montgomery testified that although Key never explicitly told Monty to default, he interpreted Smith's statement that the loan could not be transferred to LNR while the loan was current to mean that Monty should default on the loan and that LNR would then look at restructuring the loan. As Montgomery testified:

Q. Okay. Did Gail Smith or anybody else actually tell you if you default LNR or anybody else will do any specific action?

A. She said in not only the email, but in our phone conversation you're current they will not allow me to transfer it to LNR unless you become delinquent.

Q. So she tells you there's nothing we can do while it's current, right?

A. Yes.

Q. And you take that to mean then I should default?

A. Yes.

Q. She never told you to do that, did she?

A. She strongly indicated it.

Q. By sending you an email that says while you're current there's nothing that we can do?

A. Correct. And when I had a phone conversation with her, I said, I'm shocked that I can't at least explore the possibility. She said that's just how they do it.

Q.     Is it your position that Gail Smith specifically told you if and when you defaulted, LNR will modify your loan?

A.     She never said they would modify it, no.

Q.     Okay.  She said they couldn't do anything until –  or while you were current.

A.     Correct.

Q.     And you took that to mean if you default, then they'll do something, right?

A.     That they would look at it, yes.

**{¶8}** Montgomery testified that no one "ever promised to do anything other than look at" a possible restructuring of the note.   He further testified that neither Key nor LNR ever made any representations to Monty (either before or after Monty's default) regarding what LNR would do (or would not do) as part of that process.   Montgomery confirmed that the only representations LNR made prior to Monty's default were those it allegedly made to and through Smith, i.e., that while the loan was current, there was nothing that could be done to restructure the loan.

**{¶9}** Under section 1.4 of the note, the failure to pay any sum payable under the note on or before the due date constitutes an "[e]vent of [d]efault."   Upon the occurrence of an event of default, the lender has a right to accelerate the entire indebtedness — i.e., all sums advanced or accrued under the note and all unpaid interest "shall, at the option of Lender, and without notice to Borrower, at once become due and payable and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated Maturity Date." Section 2.1 of the note further provides, in relevant part:

> No failure to accelerate the debt evidenced hereby after an Event of Default, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of the Lender thereafter to insist upon strict compliance of the terms of

this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder * * *. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part unless Lender agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

The mortgage contains similar provisions.

{¶10} While communicating with Key regarding a possible loan restructuring, Monty failed to timely make the monthly loan payment due on November 11, 2011 — an event of default under the note and mortgage. Monty claims that this "technical default" resulted from a tenant's check having been returned for insufficient funds. A month later, Monty forwarded a check for the November 11, 2011 loan payment. Key received the check on December 14, 2011 and applied it to the November payment.

{¶11} Montgomery testified that Monty "intentionally" failed to make the loan payment due December 11, 2011, as well as other payments on the note when due, "in the hopes" that Key would transfer the loan to LNR. In March 2012, the loan was transferred from Key to LNR. On March 21, 2012, LNR sent a notice of transfer of servicing to Monty that explained the transfer of servicing from Key to LNR and stated, among other things, that LNR "look[ed] forward to a successful working relationship" with Monty.

{¶12} Shortly after Monty received the March 21, 2012 notice of transfer, Montgomery received a telephone call from Daniel Motha ("Motha"), an asset manager for LNR. Motha introduced himself and advised Montgomery that he would be forwarding a pre-negotiation letter for Monty to sign and a list of items LNR needed from Monty. On April 2, 2012, Motha sent Monty the pre-negotiation letter along with the list of documents Monty was to provide "in

connection with the processing of [its] request." Motha testified that this information was requested from Monty in order to determine the value of the property and the continued performance of the loan. Monty never signed the pre-negotiation letter but forwarded the documents requested. Montgomery testified that Monty did not sign the pre-negotiation letter because he had some concerns regarding the letter, including a reference in the letter to the lender's right to sell the loan without notice to Monty[4] and the expenses it stated Monty would be required to pay for an appraisal and environmental site inspection of the property. Montgomery testified that he called Motha to discuss his concerns but that Motha told him "not to be concerned with it" and that it "will go real quick," i.e., that the approval process would take less than 45 days. Montgomery testified that he believed Monty's failure to execute the pre-negotiation letter was not a problem because Motha continued to communicate with him and to request information from him as part of, what Montgomery believed to be, the loan restructuring process. There is no dispute that Monty fully complied with all of LNR's requests

---

[4] With regard to the lender's right to sell the loan, the pre-negotiation letter provided:

Lender reserves its right to take all such actions as it deems appropriate to protect its interest in the Loan and to collect the debt thereunder, including, without limitation, seeking foreclosure and/or reconveyance of its security under the Loan Documents, and the sale of the Loan to a third party without further notice or demand. Accordingly, participation in the Loan Communications shall not prevent the Lender from marketing, selling, assigning, transferring, setting over or conveying its right, title and interest in and to the Loan and any and all related security instruments that secure the indebtedness and or [sic] obligations secured by the Mortgage at any time and <u>without</u> prior notice to the Borrower or its representatives.

(Emphasis sic.) Monty does not dispute that the Trust had the right under the loan documents to sell the loan without prior notice to Monty, irrespective of this provision in the pre-negotiation letter.

for information.  Motha testified that he understood that Monty was providing documentation and information to LNR "[i]n hopes to get a restructuring."

{¶13} Over the next several months, LNR had the property appraised and used the financial documentation and information submitted by Monty to obtain opinions of value of the property from two brokers.  On June 1, 2012, Motha sent an email to Montgomery advising Monty that Motha had not yet received its offer to modify the loan.  Monty submitted an offer three days later, on June 4, 2012.

{¶14} LNR never responded to Monty's offer to restructure the loan.  Instead, Motha testified that he decided to recommend that the loan be marketed for sale.  He testified that his decision was based on Monty's missed payments, the default status of the loan, the fact the property was "so far underwater" and his conclusion that Monty was unable, at that time, to come up with sufficient funds to pay down part of the loan, as required, to get a modification approved.  Based on Motha's recommendation, the loan was listed for sale.   Although Motha testified that, in his mind, once the loan was listed for sale, any negotiations involving a possible restructuring were over, he testified that he did not advise Monty that the loan would not be restructured and would be sold.    Monty did not learn that its request to restructure the loan had been denied and that the loan had been listed for sale until after the loan was sold.

{¶15} In July 2012, the loan was sold on an auction website to Thomas Bodnar for $1,485,000.  Bodnar thereafter assigned all of his rights, title, interest, duties and obligations under the purchase agreement with the Trust to Zapata Real Estate, L.L.C. ("Zapata"), and, effective August 3, 2012, the Trust assigned all of its rights, title and interest in the mortgage and assignment of leases and rents to Zapata.  Prior to the sale of the loan to Zapata, Key held the reserve funds collected from Monty in a deposit account, maintained with an affiliate of Key, for

the benefit of the Trust. Following the sale of the loan, Key, at the direction of LNR, transferred the reserve funds from the deposit account to a custodial account maintained for the benefit of the Trust (the "reserve account"). As of the time of the sale, the reserve account contained a balance of $32,547.69.

{¶16} On August 22, 2012, Zapata sent a letter to Monty confirming Monty's payment defaults under the note and mortgage, stating that the outstanding principal balance due on the note was, therefore, accelerated and demanding immediate payment in full of all past due amounts. A day later, Zapata filed an action for judgment on the note and to foreclose on the mortgage.

{¶17} On December 7, 2012, appellants filed their answer, a counterclaim and a third-party complaint against Key and LNR. In their third-party complaint, appellants asserted claims of fraud, negligent/intentional misrepresentation, promissory estoppel, bad faith lending and civil conspiracy against Key and LNR, alleging that they had induced Monty to default on the loan and had misrepresented that they would work with Monty to restructure the loan upon default. In their combined answer to Zapata's second amended complaint, counterclaim and third-party complaint filed on May 16, 2013, appellants added claims of conversion, unjust enrichment, equitable restitution, constructive trust and money had and received against Key, based on Key's allegedly improper withholding of funds in Monty's reserve account following the sale of the loan to Zapata.

{¶18} On September 26, 2013, LNR and Key filed a motion for summary judgment on the claims asserted in appellants' third-party complaint. Appellants did not immediately respond to the motion for summary judgment. Instead, on November 19, 2013, Monty filed an amended third-party complaint, modifying the claims asserted against LNR (i.e., dismissing the

fraud, misrepresentation, bad faith lending and civil conspiracy claims and adding a new breach of the duty of good faith claim) and joining the Trust as a new third-party defendant. In its amended complaint, Monty asserted claims of promissory estoppel and breach of the duty of good faith against appellees, alleging that Key and LNR — acting on behalf of the Trust — had induced Monty to default on the loan and that Monty had reasonably relied on their representations that LNR would work with Monty to restructure the loan if it defaulted. Monty also asserted claims of conversion, unjust enrichment, equitable restitution, constructive trust and money had and received — the additional claims it had previously asserted against Key — against the Trust, alleging that the Trust had improperly retained the balance of Monty's reserve account after it sold the loan to Zapata (the "Reserve Account Claims"). Appellants sought to recover both compensatory and punitive damages for the injuries they allegedly sustained as a result of appellees' conduct. On December 13, 2013, appellants filed their opposition to LNR's motion for summary judgment and formally dismissed their counterclaim against Zapata and all of their claims against Key.

{¶19} On January 15, 2014, appellees filed a renewed motion for summary judgment based on the claims asserted in appellants' amended third-party complaint. Appellees supported their motion with copies of excerpts from the note and mortgage and the agreements relating to the sale of the loan to Zapata, copies of communications between Monty and Key and Monty and LNR related to the loan, Montgomery's deposition testimony related to his communications with Key and LNR and affidavits from Smith and Bodnar regarding the disposition of the reserve funds.

{¶20} Appellants filed their opposition on January 29, 2014. Appellants' opposition to summary judgment was supported by copies of email communications between Montgomery and

representatives of Key and LNR and between LNR and its brokers related to the loan, a copy of the transcript of the deposition of Daniel Motha, Key's loan history report for the loan and an affidavit from Montgomery detailing (1) Monty's interactions with Key and LNR during the "loan restructuring process," (2) the circumstances that led Monty to rely upon LNR's representations and (3) the extent to which Monty was allegedly damaged as result of its reliance on those representations.

{¶21} On February 24, 2014, the trial court granted summary judgment in favor of appellees on the claims asserted in the amended third-party complaint. Appellants timely appealed the trial court's order on summary judgment, raising the following assignment of error for review:

> The trial court erred and abused its discretion when it granted summary judgment in favor of Third-Party Defendants/Appellees LNR Partners, LLC * * * and Wells Fargo Bank, N.A., as trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006-C5 * * * because genuine issues of material fact exist regarding Appellees' actions and representations to Defendants/Third-Party Plaintiffs/Appellants Monty Realty Ltd. and Florence A. Montgomery (collectively, "Monty"), related to the Loan Documents, which preclude summary judgment on Monty's claims in its Amended Third-Party Complaint.

**Summary Judgment Standard**

{¶22} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.

{¶23} Pursuant to Civ.R. 56, summary judgment is proper only if: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a

matter of law and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party.

{¶24} On a motion for summary judgment, the moving party carries an initial burden of setting forth evidence of specific facts that demonstrate its entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). The moving party cannot discharge its burden simply by making conclusory assertions that the nonmoving party cannot prove its case; it must point to specific evidence in the record that demonstrates that the nonmoving party has insufficient evidence to support its claims. If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, summary judgment is appropriate only if the nonmoving party fails to evidence of specific facts establishing the existence of a genuine issue of material fact for trial. *Id.* at 293.

**Evidentiary Requirements**

{¶25} As an initial matter, we note that a number of the evidentiary materials submitted by the parties in support of their summary judgment filings do not comply with Civ.R. 56(C). Civ.R. 56(C) places strict limitations upon the types of documentary evidence that a party may use in supporting or opposing a motion for summary judgment. Under Civ.R. 56(C), the materials that may be considered on a motion for summary judgment include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence and written stipulations of fact. Other types of documents may be introduced as evidentiary material only through incorporation by reference in a properly framed affidavit. *Dzambasow v. Abakumov*, 8th Dist. Cuyahoga No. 80621, 2005-Ohio-6719, ¶ 26, citing *Lance Acceptance Corp. v. Claudio*, 9th Dist. Lorain No. 02CA008201, 2003-Ohio-3503. """Documents submitted in opposition to a motion for summary judgment which are not sworn, certified, or authenticated

by affidavit have no evidentiary value and may not be considered by the court in deciding whether a genuine issue of material fact remains for trial.""" *Bank of N.Y. Mellon Trust Co., N.A. v. Unger*, 8th Dist. Cuyahoga No. 97315, 2012-Ohio-1950, ¶ 44, quoting *Lotarski v. Szczepanski*, 8th Dist. Cuyahoga No. 68088, 1995 Ohio App. LEXIS 5591, *9-10 (Dec. 20, 1995), quoting *Green v. B.F. Goodrich Co.*, 85 Ohio App.3d 223, 228, 619 N.E.2d 497 (9th Dist.1993). Before a deposition transcript can be considered as "legally acceptable evidence for summary judgment purposes": (1) the transcript must be filed with the court or otherwise authenticated; (2) the deponent must sign the deposition transcript or waive signature and (3) there must be a certification by the court reporter before whom the deposition was taken. *Unger*, 2012-Ohio-1950 at ¶ 43. Affidavits submitted in support of or opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." Civ.R. 56(E).

{¶26} These requirements were not met with respect to many of the summary judgment materials submitted by the parties in this case. For example, the original, complete transcripts of the depositions of Daniel Motha and Mark Montgomery were not filed with the court and the copies of the portions of the transcripts attached to the parties' summary judgment filings did not include signatures of the deponents, any indication that the deponents had waived signature or any certification of the transcripts by the court reporter. Likewise, a number of the documents relied upon by the parties were not properly authenticated and the affidavits of Mark Montgomery and Thomas Bodnar did not identify the roles or positions they held in the entities on whose behalf they offered the affidavits and did not otherwise explain the basis of their

claimed personal knowledge regarding the facts attested therein. Accordingly, much of the parties' evidence was not in the form required for consideration on summary judgment.

{¶27} However, since neither party objected to the form of the evidence submitted by the other, it could be considered by the trial court in ruling on appellees' motion for summary judgment within the court's discretion. *See, e.g., Dzambasow*, 2005-Ohio-6719 at ¶ 27 ("'[I]f the opposing party fails to object to improperly introduced evidentiary materials, the trial court may, in its sound discretion, consider those materials in ruling on the summary judgment motion.'"), quoting *Christe v. GMS Mgt. Co., Inc.*, 124 Ohio App.3d 84, 90, 705 N.E.2d 691 (9th Dist.1997); *Papadelis v. First Am. Sav. Bank,* 112 Ohio App.3d 576, 579, 679 N.E.2d 356 (8th Dist.1996) ("'When ruling on a motion for summary judgment, a trial court may consider documents other than those specified in Civ.R. 56(C) in support of the motion when no objection is raised by the party against whom the motion is directed.'"), quoting *Rodger v. McDonald's Restaurants of Ohio, Inc.*, 8 Ohio App.3d 256, 456 N.E.2d 1262 (8th Dist.1982), paragraph one of the syllabus. Given that the parties relied on many of the same documents and there appears to be no dispute with respect to the authenticity or completeness of the materials submitted, we do not believe that the trial court abused its discretion in considering the materials in ruling on summary judgment.

**Claims Related to the Reserve Account**

{¶28} Turning to the merits, appellants first argue that because there is no dispute that the Trust retained control over the reserve funds and did not return those funds to Monty after the loan was sold to Zapata in July 2012, the trial court improperly granted summary judgment in favor of the Trust on the Reserve Account Claims. We disagree.

{¶29} Section 1.8(a) of the mortgage provides, in relevant part:

If an Event of Default shall occur, then Lender may, without notice or demand on Borrower, at its option: (A) withdraw any or all of the funds (including without limitation, interest) then remaining in the Reserves and apply the same, after deducting all costs and expenses of safekeeping, collection and delivery (including, but not limited to, attorneys' fees, costs and expenses) to the indebtedness evidenced by the Note or any other obligations of Borrower under the Loan Documents in such manner as Lender shall deem appropriate in its sole discretion, and the excess, if any, shall be paid to Borrower * * * .

Section 1.8(b) of the mortgage further provides, in relevant part:

Upon assignment of this Mortgage by Lender, any funds in the Reserves shall be turned over to the assignee and any responsibility of Lender, as assignor, with respect thereto shall terminate. The Reserves shall not, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Lender's option and in Lender's discretion, may either be held in a separate account or be commingled by Lender with the general funds of Lender. Upon full payment of the indebtedness secured hereby in accordance with its terms * * * or at such earlier time as Lender may elect, the balance in the Reserves then in Lender's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

{¶30} Accordingly, under the terms of the mortgage, after Monty defaulted, the lender, i.e., first the Trust and then Zapata by assignment from the Trust, had the right to withdraw the balance remaining in the reserve account and to apply those funds to reduce Monty's indebtedness under the note (or any other obligations under the loan documents).

{¶31} An essential element of each of Monty's Reserve Account Claims is Monty's alleged right to receive the balance of the funds in the reserve account. Under the terms of the mortgage, Monty has a right to the balance of the reserves only "[u]pon full payment of the indebtedness secured [by the mortgage] in accordance with its terms." It is, however, undisputed that Monty owes Zapata more than $3 million dollars pursuant to loan documents and has not made "full payment of the indebtedness" under the note "in accordance with its terms," as necessary to trigger the requirement under the mortgage that "the balance in the Reserves then in Lender's possession * * * be paid over to Borrower." Monty, therefore, has not met its

burden of establishing the existence of a genuine issue of material fact regarding its right to receive the reserve funds. Further, although it does not appear that the Trust ever turned the balance of the reserve account over to Zapata following the sale,[5] there is no evidence that Monty has been harmed by the Trust's alleged improper retention of the reserve funds because, as stated in the affidavit of Thomas Bodnar, Zapata has agreed to apply an amount equal to the balance of the reserve funds at the time of the sale of the loan to the balance Monty owes Zapata on the loan — as the lender is permitted to do under the mortgage following a default. Accordingly, we find that the trial court properly entered summary judgment in favor of the Trust on Monty's Reserve Account Claims.

**Promissory Estoppel**

{¶32} Appellants likewise contend that the trial court erred in entering summary judgment in favor of appellees on their promissory estoppel claim. Appellants maintain that they presented sufficient evidence to create a genuine issue of material fact as to each element of their promissory estoppel claim. Once again, we disagree.

{¶33} Appellants' promissory estoppel claim is based on a series of alleged representations by or on behalf of LNR that LNR would attempt to restructure the loan. Appellants allege that in November 2011, Key and LNR (acting on behalf of the Trust) together

---

[5]In an affidavit submitted in support of Key's motion for summary judgment, Key account manager, Gail Smith, stated that "[b]oth prior to and following the Trust's sale of the Loan to Zapata, * * * the Trust retained ownership of the Escrowed Funds." Under the mortgage, upon assignment of the mortgage to Zapata, the funds in the reserves were to have been turned over to Zapata, and Zapata was to have assumed responsibility with respect to those funds. In the agreement for sale and purchase of loan, however, the Trust and Zapata (as the assignee of Bodnar) agreed that the Trust would retain the balance of the reserve account and that Zapata would be responsible for reestablishing and funding the reserve account with a sum equal to the balance of the reserve account at the time of closing of the sale.

represented to Monty that LNR "would work with Monty to restructure the loan post-default." Appellants contend that, in reasonable reliance upon those representations and to trigger the loan restructuring process, Monty intentionally failed to make the December 2011 loan payment "in the hopes" that the loan would be restructured. Appellants further allege that from March 2012 (after LNR took over servicing of the loan) until July 2012 (when the loan was sold), LNR continued to represent to Monty that it was, in fact, working with Monty to restructure the loan, i.e., by requesting financial information and an offer to restructure the loan from Monty. Monty contends that it would not have "lost the property to sale" had it not relied on these continued representations. Monty does not dispute that the loan documents were never modified and does not contend that Key or appellees ever promised Monty that the loan would be restructured if it defaulted.

{¶34} Promissory estoppel is an equitable doctrine for enforcing promises that are reasonably relied upon. *Rucker v. Everen Secs., Inc.*, 102 Ohio St.3d 1247, 2004-Ohio-3719, 811 N.E.2d 1141, ¶ 6, citing *Karnes v. Doctors Hosp.*, 51 Ohio St.3d 139, 142, 555 N.E.2d 280 (1990). It has been summarized as follows:

> "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

*McCroskey v. State*, 8 Ohio St.3d 29, 30, 456 N.E.2d 1204 (1983), quoting Restatement of the Law 2d, Contracts, Section 90 (1973).

{¶35} To prevail on a claim for promissory estoppel, a party must establish four elements: (1) there must be a clear and unambiguous promise, (2) the party to whom the promise was made must rely on it, (3) the reliance must be reasonable and foreseeable and (4) the party relying on

the promise must have been injured by the reliance. *Ruple v. Midwest Equip. Co.*, 8th Dist. Cuyahoga No. 95726, 2011-Ohio-2923, ¶ 27.

**{¶36}** The "clear and unambiguous promise" necessary to support a claim of promissory estoppel "is one that the promisor would expect to induce reliance." *Moellering Indus., Inc. v. Nalagatla*, 12th Dist. Warren No. CA2012-10-104, 2013-Ohio-3995, ¶15, citing *McCroskey* at 30. It is "'not satisfied by vague or ambiguous references.'" *Id.*, quoting *Hitchcock Dev. Co. v. Husted,* 12th Dist. Warren No. CA2009-04-043, 2009-Ohio-4459, ¶ 24. Based on our review of the record, it is apparent that there were no promises made by LNR related to the restructuring of the loan that LNR should have reasonably expected would induce reliance by Monty. *Moellering* at ¶ 25 (where bank's statements were ambiguous and contractor's reliance "was seemingly based on assumptions and conjectures," bank could not have expected that its statements would have induced reliance).

**{¶37}** Appellants do not identify any *specific* representation allegedly made by or on behalf of LNR at any time in which LNR committed itself to engage in a loan restructuring process with Monty. Although appellants argue that "the record is replete with evidence that [a]ppellees represented to Monty that LNR would work with Monty post-default" and that this "creates a genuine issue of material fact as to the promises [a]ppellees made," the evidence appellants cite in support of this claim tells a different story. With respect to the representations allegedly made by LNR pre-default, appellants identify: (1) Smith's November 17, 2011 email to Montgomery indicating that LNR is not recommending a transfer of the loan to special servicing because the loan is current and (2) Montgomery's deposition testimony regarding his communications with Key prior to Monty's default. With respect to the representations allegedly made by LNR post-default, Monty points to: (1) the statement in the March 21, 2012

notice of transfer of servicing from LNR, "thank[ing]" Monty "for its cooperation" and indicating that LNR "look[s] forward to a successful working relationship"; (2) the April 2, 2012 pre-negotiation letter and checklist of documents Monty was asked to provide to LNR "in connection with the processing of your request"; (3) Motha's deposition testimony regarding his understanding that Monty was providing documentation and information to LNR "[i]n hopes to get a restructuring" and (4) the June 1, 2012 email from Motha to Monty requesting Monty's offer to modify the loan.

{¶38} None of this evidence, whether considered in isolation or together, evidences any promise by or on behalf of appellees that LNR would "work with Monty to restructure the loan" if Monty defaulted or that LNR would continue to work with Monty throughout the restructuring process following Monty's default. Although Montgomery testified that he took Smith's statements to mean that if Monty defaulted, LNR "would look at" a possible restructuring of the loan, and that he took Motha's requests for documentation and information after LNR's default to mean that the loan was in the process of being restructured, Montgomery's subjective interpretation of his communications and interactions with Key and LNR does not transform those communications and interactions into a commitment by LNR to work with Monty throughout the loan restructuring process to restructure the loan. Because Monty has not shown that Key or LNR ever promised Monty that LNR would, in fact, "work with Monty to restructure the loan" (or pointed to any evidence showing a genuine issue of fact to be litigated regarding the existence of such a promise), the trial court did not err in entering summary judgment on appellants' promissory estoppel claim.

{¶39} Even if the evidence identified by appellants could be reasonably construed to constitute a representation by LNR that it would "work with Monty to restructure the loan," such

a representation would not constitute a "clear and unambiguous promise" sufficient to give rise to a promissory estoppel claim. A promise, for purposes of a promissory estoppel, is "'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Dailey v. Craigmyle & Son Farms, LLC*, 177 Ohio App.3d 439, 2008-Ohio-4034, 894 N.E.2d 1301, ¶ 14 (4th Dist.), quoting *Stull v. Combustion Eng. Inc.*, 72 Ohio App.3d 553, 557, 595 N.E.2d 504 (3d Dist.1991). A "clear and ambiguous promise" for purposes of a promissory estoppel claim, therefore, is one in which a party clearly promises to another that it will do, or refrain from doing, something specific. Based upon the record in this case, there is no doubt that LNR made no such promise to Monty related to the restructuring of Monty's loan.

{¶40} Even assuming LNR promised to "work with Monty to restructure the loan," what does it mean for a lender to agree to "work with" a borrower to "restructure" a loan? There is no dispute that LNR "worked with" Monty in the sense that it requested and received documentation and information from Monty, including an offer for a proposed loan modification, related to a possible restructuring of the loan. Monty offers no evidence contradicting Motha's testimony that he reviewed the information and materials submitted by Monty and made the decision to recommend the sale of the loan only after determining that the property was "so far underwater" and that Monty was unable, at that time, to come up with sufficient funds to pay down part of the loan as necessary to get a modification approved. Monty, however, apparently contends that "working with Monty to restructure the loan" required something more. Given that there is no dispute that LNR did not promise to restructure the loan, what that "something more" is, however, remains unclear. Where, as here, an alleged promise is sufficiently vague or ambiguous that the parties do not have a clear understanding that a commitment has been made

and, specifically, what that commitment is or requires, there is no promise to be enforced under the doctrine of promissory estoppel. *See, e.g., Hammill Mfg. Co. v. Park-Ohio Indus.*, 6th Dist. Lucas No. L-12-1121, 2013-Ohio-1476, ¶ 18-20 (trial court did not err in granting summary judgment in favor of defendant on promissory estoppel claim where defendant represented that it would get invoice "taken care of" but never stated that anyone would pay plaintiff); *Garb-Ko, Inc. v. Benderson*, 10th Dist. Franklin Nos. 12AP-430, 12AP-474, 12AP-475, and 12AP-476, 2013-Ohio-1249, ¶ 20 (plaintiff's complaint failed to state a claim for promissory estoppel where defendants allegedly represented in correspondence that plaintiff had "renewal options" but did not set forth a promise that plaintiff had an option to renew, "much less 'a clear, unambiguous promise'"). Because the alleged promise in this case is ambiguous on its face, appellants cannot establish the first element of their promissory estoppel claim. Accordingly, the trial court did not err in entering summary judgment in favor of appellees on that claim.

**Reasonable Reliance and Resulting Injury**

{¶41} To prevail on their promissory estoppel claim, appellants must also establish that Monty reasonably relied upon LNR's alleged promise to work with Monty to restructure the loan and was injured as a result of its reliance on this alleged promise. Even if we were to find that LNR made the alleged promise and that the alleged promise was sufficiently clear and unambiguous to give rise to a claim of promissory estoppel, we would still conclude that summary judgment is appropriate because there is no genuine issue of material fact that Monty did not reasonably rely on LNR's alleged promise to "work with" Monty to "restructure the loan" and no evidence that Monty's claimed injury resulted from its reliance on that alleged promise.

{¶42} The injury Monty claims to have sustained as a result of its reliance on LNR's representations is the loss of the Cornerstone property in the pending foreclosure action.

Appellants contend that Monty would not have defaulted on the loan in the first instance and would not have otherwise "lost the property to sale" were it not for appellants' representations that LNR would work with Monty to restructure the loan if it defaulted and was, in fact, working with Monty to restructure the loan after Monty's default. However, the facts do not support these contentions.

{¶43} Appellees presented evidence of numerous references in the loan documents making it clear that Monty could not rely on oral representations from Key or LNR purporting to modify the loan documents unless those representations were reduced to writing and signed by the parties. The March 21, 2012 notice of transfer of servicing similarly stated:

> No modification of the Loan Documents and no other agreement or understanding of any nature shall be deemed to have been entered into by or be binding on Lender or Special Servicer unless and until Lender and Borrower have reached agreement on all issues, and such entire agreement shall have been reduced to a written document that expressly states that it modifies the Loan Documents and is duly executed by Lender, Borrower and any guarantor of the Loan. Oral agreements, emails, memoranda of meetings, summaries of proposed terms, etc., shall have no effect whatsoever and shall not be binding on Lender or Special Servicer.

{¶44} Monty argues that these provisions are irrelevant because the promise that forms the basis of appellants' promissory estoppel claim is that LNR "would work with Monty toward restructuring the loan" not that appellees would, in fact, modify the terms of the loan. However, even if they do not, per se, preclude Monty's argument, they reveal the very tenuous nature of the promise on which Monty allegedly relied.

{¶45} As Monty concedes, there was no guarantee that the loan would be restructured if it defaulted. By intentionally defaulting, Monty was banking on the *possibility* that LNR *might* thereafter agree to restructure the loan in a way that was favorable to Monty.

{¶46} Furthermore, it is undisputed that, by the time it "intentionally" missed the December 2011 payment, Monty had already defaulted on the loan based on its failure to timely make the November 2011 loan payment — a default that had nothing to do with its reliance on any representations allegedly made by Key or LNR. Monty attempts to create an issue of fact as to the timing of its default by arguing that the November 2011 default was merely "technical" and was cured when Monty submitted (and appellees accepted) a loan payment on December 14, 2011. Monty, however, cites to no evidence in the record or any authority supporting this contention. Neither the note nor mortgage provides that an event of default can be cured by the borrower submitting, and the lender accepting, a late payment. Because Monty was already in default when it "intentionally" failed to make the December 2011 payment, it cannot be said that Monty detrimentally relied on Key or LNR's representations in defaulting on the loan.

{¶47} We reach the same conclusion, albeit for a different reason, with respect to Monty's contention that it lost the property as a result of its reasonable reliance on representations made by LNR after Monty defaulted on the loan. The only "evidence" appellants offer in support of this contention is a handful of conclusory assertions in Montgomery's affidavit that if LNR had not promised to work with Monty throughout the loan restructuring process or had otherwise notified Monty that Monty's offer to restructure the loan had been rejected, Monty would have presented another offer, approached investors, secured funds to rework the loan, cured its default, purchased the loan at the sale or otherwise "done what it took to maintain ownership of the property." However, an affidavit submitted on summary judgment must contain more than conclusory assertions to create a genuine issue of material fact for trial:

"Generally, a party's unsupported and self-serving assertions, offered by way of affidavit, standing alone and without corroborating materials under Civ.R. 56, will not be sufficient to demonstrate material issues of fact. Otherwise, a party could avoid summary judgment under all circumstances solely by simply submitting such a self-serving affidavit containing nothing more than bare contradictions of the evidence offered by the moving party."

*Davis v. Cleveland*, 8th Dist. Cuyahoga No. 83665, 2004-Ohio-6621, ¶ 23, quoting *Bell v. Beightler*, 10th Dist. Franklin No. 02AP-569, 2003-Ohio-88, ¶ 33.

{¶48} Because Montgomery's conclusory statements were unsupported by any facts or evidence, Montgomery's affidavit does not create a genuine issue of fact as to whether Monty's loss resulted from its alleged reliance on any promise to work with Monty to restructure the loan. The trial court, therefore, properly entered summary judgment in favor of appellees on appellants' promissory estoppel claim.[6]

**Breach of Duty of Good Faith**

{¶49} Monty also contends that the trial court erred in entering summary judgment on its claim for breach of the duty of good faith under former R.C. 1301.09 and 1301.14.[7] Turning first to Monty's claim under former R.C. 1301.14, that provision states:

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of

---

[6] Because we find that appellants cannot establish essential elements of their promissory estoppel claim, we do not address appellees' argument that Monty's promissory estoppel claim was barred by the statute of frauds.

[7] Effective June 29, 2011, R.C. 1301.09 was amended and renumbered as R.C. 1301.304, and R.C. 1301.14 was renumbered as 1301.309. 2011 H.B. 9. These amendments apply only to "transactions entered into on or after the effective date of the act." *Id.* at 3. Because the transaction here was entering into prior to 2011, the prior code provisions are referenced herein.

establishing lack of good faith is on the party against whom the power has been exercised.

**{¶50}** In this case, it is undisputed that neither LNR nor the Trust ever accelerated payment, accelerated performance or required collateral or additional collateral from Monty. As Monty repeatedly acknowledges, it was Zapata who accelerated the principal balance of the note in August 2012. Accordingly, Monty cannot meet its burden of establishing that appellees breached a duty of good faith under former R.C. 1301.14.

**{¶51}** We reach the same conclusion with respect to Monty's claim that appellees breached the duty of good faith under R.C. 1301.09. Former R.C. 1301.09 provides that "[e]very contract or duty within Chapters 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Revised Code imposes an obligation of good faith in its performance or enforcement." "[G]ood faith" means "honesty in fact in the conduct or transaction concerned." R.C. 1301.01(S).

**{¶52}** Monty's claim for breach of the duty of good faith under R.C. 1301.09 is premised on allegations that after the servicing of the loan was transferred to LNR, Monty was "led down a path to believe LNR was working with Monty to restructure the loan," i.e., by collecting financial information and an offer to restructure the loan from Monty when, in actuality, LNR was sharing Monty's information with local brokers, preparing to market the loan and ultimately listing the loan for sale. Although appellants concede that the Trust had the right, under the loan documents, to sell the loan without prior notice to Monty, they argue that that right was "limited by the obligation to act in good faith" and that appellees' failure to exercise that right in good faith constitutes a breach of contract.

**{¶53}** Appellees maintain that under Ohio law, there is no claim for breach of the duty of good faith without a breach of some term of the parties' contract and that the trial court properly entered summary judgment on appellants' "bad faith" claim because appellants have not alleged — much less established — any breach of contract. Appellants respond that a breach of the duty of good faith in and of itself constitutes a breach of contract and that they are not required to identify a separate breach of contract in order to defeat summary judgment on a claim for breach of the duty of good faith.

**{¶54}** The Official Comment to R.C. 1301.09 (UCC 1-203), however, undermines appellants' argument, clearly stating that the section should not be construed to create an independent cause of action:

> This section sets forth a basic principle running throughout this Act. The principle involved is that in commercial transactions good faith is required in the performance and enforcement of all agreements or duties. * * * This section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that *a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract* or makes unavailable, under the particular circumstances, a remedial right or power. This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and *does not create a separate duty of fairness and reasonableness which can be independently breached.*

(Emphasis added.)

**{¶55}** Appellants have not identified any "specific duty or obligation" under the loan documents that appellees allegedly "fail[ed] to perform or enforce." There is no claim that the loan documents required appellees to notify Monty that they had decided to sell, rather than restructure, the loan. It is well established in Ohio that a lender does not act in "bad faith" when it decides to exercise its contract rights. *Snowville Subdivision Joint Venture Phase I, v. Home*

*S. & L. of Youngstown*, 8th Dist. Cuyahoga No. 96675, 2012-Ohio-1342, ¶ 26; *see also Banc Liquidating Co. v. Ameritrust*, 86 Ohio App.3d 646, 649, 621 N.E.2d 760 (8th Dist.1993). As this court has previously explained: "'Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'" *Snowville* at ¶ 28, quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990). In this case, the Trust was merely exercising its rights under the loan documents when it sold the loan to Zapata. Appellants' claim for breach of the duty of good faith, therefore, fails as a matter of law and the trial court properly granted summary judgment in favor of appellees on that claim.

**{¶56}** Based on the record before us, we find that appellants cannot establish essential elements of each of their claims. Summary judgment was, therefore, appropriate, and Monty's assignment of error is overruled.

**{¶57}** Judgment affirmed.

It is ordered that appellees recover from appellants the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
PATRICIA A. BLACKMON, J., CONCUR