[Cite as *Baber v. Ohio Mut. Ins. Co.*, 2021-Ohio-1625.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**SHELBY COUNTY**

LORMA BABER,

      PLAINTIFF-APPELLANT,               CASE NO.  17-20-10

      v.

OHIO MUTUAL INSURANCE
COMPANY ET AL.,                    O P I N I O N

      DEFENDANTS-APPELLEES.

Appeal from Shelby County Common Pleas Court
Trial Court No. 19CV000239

**Judgment Affirmed**

Date of Decision:   May 10, 2021

APPEARANCES:

      *Stanley R. Evans* **for Appellant**

      *Joseph F. Nicholas and Frank H. Scialdone* **for Appellee**

**MILLER, J.**

{¶1} Plaintiff-appellant, Lorma Baber, appeals the May 21, 2020 decision of the Shelby County Court of Common Pleas granting the motion for summary judgment of defendant-appellee, Allenbaugh Insurance Agency ("AIA"). For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶2} Baber is the owner of a farm and farmhouse located in Maplewood, Ohio. On October 12, 2017, the farmhouse was severely damaged by a fire. While the fire was still in progress, Baber contacted AIA to report the fire and to file an insurance claim. Baber's insurance policy, which was underwritten by United Ohio Insurance Company, a subsidiary of Ohio Mutual Insurance Company ("OMIC"), was procured for her by AIA. Under the terms of the insurance policy, Baber could receive either the actual cash value of the damage caused by the fire or the costs to repair or rebuild the farmhouse up to the policy limit of $284,000. However, the policy included the following provision: "We pay no more than the actual cash value of the damage unless and until actual repair or replacement is complete. If repair or replacement of the damage is not completed within 180 days after loss, we pay no more than the actual cash value of the damage."

{¶3} On December 13, 2017, Baber received a letter from OMIC's claims adjuster, Leann Wente. Wente explained that OMIC had determined the actual cash

value of the damage caused by the fire to be $201,506.05 and that Baber would be issued a check in that amount. In addition, the letter restated the full text of the 180-day provision. Wente instructed Baber that if Baber did not repair or rebuild the farmhouse within 180 days from the date of the fire as required by the 180-day provision, OMIC would pay no more than the actual cash value. Wente indicated Baber thus had until April 10, 2018, to repair or rebuild the farmhouse. Enclosed with Wente's letter was an estimate of the costs to rebuild the farmhouse prepared by OMIC's chosen construction contractor.

{¶4} Shortly after receiving Wente's letter, Baber contacted Greg Woolley, AIA's co-owner/insurance agent, to talk about the 180-day provision and to express her concerns about rebuilding the farmhouse by the April 10, 2018 deadline. Although Baber was inclined to rebuild the farmhouse, she was worried the work would not be completed by the deadline, in part because she did not receive OMIC's estimate until two months after the fire. Baber was also concerned inclement winter weather could delay completion of the rebuild. According to Baber, she communicated these concerns to Woolley, and Woolley responded by telling her OMIC would be "fair" with respect to the 180-day provision and the April 10, 2018 deadline. Baber said she understood Woolley's statement as an assurance that OMIC would be flexible with the 180-day provision and that she could still recover the full policy limit of $284,000 even if the farmhouse was not rebuilt by the

deadline. However, Woolley denied making any promises to Baber about the 180-day provision or the deadline. Regardless, after Baber and Woolley's December 2017 conversation, Baber decided to rebuild the farmhouse.

{¶5} In the months following Baber and Woolley's December 2017 conversation, Baber arranged to have the farmhouse rebuilt. Baber hired her own contractor, Nathan Persinger, to prepare an estimate for the construction work required to rebuild the farmhouse. Baber had used Persinger for other projects, and he was at the farmhouse a few days after the fire as he had previously been hired to do repairs to the barn. The record does not indicate when Baber requested Persinger to prepare the estimate, but it was not until March 7, 2018, that Baber received Persinger's estimate. Persinger proposed to rebuild the farmhouse for $331,620. On March 9, 2018, Baber accepted Persinger's proposal. Construction on the farmhouse commenced shortly thereafter.

{¶6} On or about March 13, 2018, Wente sent a second letter to Baber. In this letter, Wente indicated that the April 10, 2018 deadline had been extended and that "the 180 day replacement cost clause [would] expire May 26, 2018." While Baber acknowledged the topic of extending the April 10, 2018 deadline had been raised during previous conversations with Wente, Baber insisted she did not specifically request an extension. Once she received Wente's second letter, Baber talked to Persinger and asked him whether the work on the farmhouse could be

completed by the new May 26, 2018 deadline. Persinger told Baber it would be impossible to finish rebuilding the farmhouse by May 26, 2018. Although Persinger continued working on the farmhouse after Baber informed him of the new deadline, construction was not completed by May 26, 2018.

{¶7} On or about May 31, 2018, Wente sent a third and final letter to Baber. In this letter, Wente confirmed that "because the repairs were not completed by May 26, 2018, [OMIC would] be unable to pay the replacement cost difference and therefore there [would] be no further payments for the dwelling." Thus, Baber received only the $201,506.05 check for the actual cash value of the damage caused by the fire. Baber has used most of the money she received from OMIC to pay Persinger for his work on the farmhouse, which remains unfinished.

{¶8} On October 11, 2019, Baber filed a complaint against OMIC and AIA. Baber's complaint stated a cause of action for breach of contract against OMIC and a cause of action for promissory estoppel against both OMIC and AIA.[1] In her complaint, Baber alleged Woolley had represented that she was not required to completely rebuild the farmhouse on or before April 10, 2018, in order to receive the full policy limit of $284,000. Baber further alleged she relied to her detriment on Woolley's representations because she failed to negotiate a contract with

---

[1] On March 18, 2020, all "existing and potential claims" against OMIC were dismissed with prejudice by agreement of the parties.

Persinger requiring Persinger to rebuild the farmhouse on or before April 10, 2018. On November 14, 2019, AIA filed its answer to Baber's complaint.

{¶9} On March 13, 2020, AIA filed a motion for summary judgment on Baber's claim of promissory estoppel. Thereafter, Baber filed her memorandum in opposition to AIA's motion for summary judgment, and AIA filed a reply brief in support of its motion for summary judgment.

{¶10} On May 21, 2020, the trial court granted AIA's motion for summary judgment. The trial court concluded that even if Woolley did promise Baber that OMIC would be "fair" concerning the 180-day provision and the April 10, 2018 deadline, Woolley's promise was not clear and unambiguous. The trial court found that Woolley's alleged promise was not sufficiently specific to induce the reliance necessary to sustain a claim for promissory estoppel.

## II. Issue Raised on Appeal

{¶11} On June 19, 2020, Baber timely filed a notice of appeal asserting one assignment of error:

> **The trial court erred in awarding summary judgment against Appellant, Lorma Baber, and in favor of Appellee, Allenbaugh Insurance Agency.**

{¶12} In her assignment of error, Baber contends the trial court erred by granting AIA's motion for summary judgment. Specifically, Baber argues the trial court erred by focusing solely on the words of Woolley's alleged promise when it

determined Woolley's alleged promise was not clear and unambiguous. Baber maintains that when determining whether a promise is clear and unambiguous, courts are "obligated to review the evidence in its totality, which necessarily includes facts and circumstances, rather than snippets and 'sound bites.'" She contends when all the facts and circumstances surrounding Woolley's alleged promise are taken into account, there is a genuine issue of material fact as to whether Woolley's alleged promise was clear and unambiguous.

### III. Discussion

**A.    Standard of Review for Summary Judgment**

{¶13} We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 3d Dist. Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25.

{¶14} Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994). Material facts are those facts "'that might affect the outcome of the suit under the governing law.'" *Turner v. Turner*, 67 Ohio St.3d 337, 340

(1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Whether a genuine issue exists is answered by the following inquiry: [d]oes the evidence present 'a sufficient disagreement to require submission to a jury' or is it 'so one-sided that one party must prevail as a matter of law[?]'" *Id.*, quoting *Anderson* at 251-252.

{¶15} "The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact." *Carnes v. Siferd*, 3d Dist. Allen No. 1-10-88, 2011-Ohio-4467, ¶ 13, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). "In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Id.*, citing *Dresher* at 292. "The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings." *Id.*, citing *Dresher* at 292 and Civ.R. 56(E).

**B.     Promissory Estoppel and the Requirement of a Clear, Unambiguous Promise**

{¶16} "Promissory estoppel is an equitable doctrine for enforcing the right to rely on promises." *Ringhand v. Chaney*, 12th Dist. Clermont Nos. CA2013-09-072 and CA2013-09-076, 2014-Ohio-3661, ¶ 20. "'The doctrine of promissory estoppel comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice.'" *Olympic Holding Co., L.L.C. v.*

*ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057, ¶ 39, quoting *Doe v. Univision Television Group, Inc.*, 717 So.2d 63, 65 (Fla.App.1998).

{¶17} The Supreme Court of Ohio has summarized the doctrine of promissory estoppel as follows: "'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, ¶ 23, quoting 1 Restatement of the Law 2d, Contracts, Section 90, at 242 (1981). "To prevail on a claim for promissory estoppel, a party must establish four elements: (1) there must be a clear and unambiguous promise, (2) the party to whom the promise was made must rely on it, (3) the reliance must be reasonable and foreseeable, and (4) the party relying on the promise must have been injured by the reliance." *Zapata Real Estate, L.L.C. v. Monty Realty, Ltd.*, 8th Dist. Cuyahoga No. 101171, 2014-Ohio-5550, ¶ 35.

{¶18} A promise is "'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Stull v. Combustion Engineering, Inc.*, 72 Ohio App.3d 553, 557 (3d Dist.1991), quoting 1 Restatement of the Law 2d, Contracts, Section 2(1), at 8 (1981). In the context of a claim for promissory estoppel, a promise is "clear and unambiguous" if it is "the type that a promisor would expect

-9-

to induce reliance." *Casillas v. Stinchcomb*, 6th Dist. Erie No. E-04-041, 2005-Ohio-4019, ¶ 19. "'This element is not satisfied by vague or ambiguous references.'" *Moellering Indus., Inc. v. Nalagatla*, 12th Dist. Warren No. CA2012-10-104, 2013-Ohio-3995, ¶ 15, quoting *Hitchcock Dev. Co. v. Husted*, 12th Dist. Warren No. CA2009-04-043, 2009-Ohio-4459, ¶ 24. If an alleged promise is so indefinite that the parties are unsure that a commitment has been made or are unable to determine what the commitment requires, the promise is not enforceable under the doctrine of promissory estoppel. *See Zapata* at ¶ 40.

## C.    The Alleged Promise

{¶19} In support of its motion for summary judgment, AIA submitted Woolley's and Baber's deposition transcripts. As indicated earlier, Woolley persistently denied he made any promises to Baber, and his deposition testimony is consistent with this position. (*See* Woolley Depo. at 24-27, 32-33). In contrast, Baber in her deposition repeatedly testified that Woolley made a promise to her that OMIC would be "fair" about the 180-day provision and the April 10, 2018 deadline. However, she described Woolley's promise differently at different points during her deposition. For example, Baber stated she contacted Woolley about the 180-day provision and recalled Woolley telling her the company would be fair given the time period it took in getting an estimate for repairs. (Baber Depo. at 41). Later in her

deposition, Baber attempted to elaborate on her understanding of the alleged promise as follows:

[Q]:  [Y]ou can't be more specific than – other than [Woolley] telling you * * * the company will be fair with you?

[A]:  That's correct.

[Q]:  Did he say to you that the company will waive [the 180-day provision], words to that effect?

[A]:  I had the impression they would work with me on that date.

[Q]:  Okay.  Let's explore that.  You said you had the assumption that they would work with you.  What was that assumption based on?

[Baber's Counsel]:  Objection.

[Q]:  Let me be more specific.

[Baber's Counsel]:  Go ahead and answer.

[Q]:  [Woolley] indicated to you or words to the effect of * * * the company will be fair with you.  From that conversation, you assumed the company would waive the 180-day provision in the policy?

[A]:  Waive it totally, I can't say that I assumed that.

[Q]:  Okay.

[A]:  There was, you know, an emphasis on completion, and I questioned whether that – as far as their – they wanted to make sure that the property would be completed, that I just wouldn't take the money and run.

> At some point – and I'm not sure whether [Wente] or [Woolley] said that, but that pictures would be taken and decision made accordingly.

> [Q]: Did Mr. Woolley ever represent to you at any time * * * that all repairs did not have to be made before April 10th of 2018 in order for you to receive the full replacement cost?

> [A]: He said they would be fair.

> [Q]: That's not the question. You already told me that he told you they would be fair. My question to you specifically is – and I'm not trying to be difficult. That is your claim against the agency.

> [A]: Yes.

> [Q]: You've essentially alleged that the agency wronged you somehow, was negligent somehow, promised you something that wasn't delivered on, okay? So, I want to know from your own testimony sitting here today: Did Mr. Woolley tell you * * * that all repairs to your property did not have to be made before April 10th in order for you to receive the full replacement cost of the policy? * * * He didn't say that, did he?

> [A]: He said it, but he didn't put it into those exact words. In other words, in being fair, taking – what photos were being done and what had been completed, that considerations would be made.

(Baber Depo. at 63-66).

{¶20} In a later exchange, Baber again attempted to describe Woolley's alleged promise that OMIC would be "fair":

> [Q]: Did you tell [OMIC], specifically Leann Wente, that [Woolley] represented to you that all the repairs did not have to be made by April 10th in order for you to receive full replacement cost?

-12-

[A]:    I told her that he told me that [OMIC] would be fair.

[Q]:    Right. So you didn't tell her that [Woolley] represented to you that all repairs didn't have to be made by April 10th? You didn't tell her that, did you?

[A]:    I did not state it in that way.

[Q]:    Why wouldn't you tell her that?

[A]:    That isn't exactly what he said. I told her what he said. * * * Okay. He said they'd be fair and that amount would not have to be completed by that date, with considerations being made because of the weather and because of the type of structure with the company.

        * * *

[Q]:    He told you repairs did not have to be made within 180 days of the fire in order for you to get full replacement cost? Is that what he told you?

[A]:    His specific words were that the company would be fair.

[Q]:    I understand that. You alleged different than that though in the complaint. You're aware of that, right?

[A]:    That was the way I took that wording to be, that the dates were, although they would not change in writing, that they would be considering the other things.

[Q]:    Okay. So now you're telling me when he told you they would be fair, you took from that statement that you didn't have to worry about the 180-day time period, correct?

[A]:    Not that you wouldn't have to worry about it. You still work toward that.

(Baber Depo. at 95-97).

**{¶21}** Only once in her deposition did Baber claim that Woolley's alleged promise went beyond an assurance that OMIC would be "fair." When asked whether Woolley specifically represented to her that "all repairs to the residence did not have to be made on or before April 10, 2018, in order for [her] to receive additional replacement value," Baber responded, "Yes." (Baber Depo. at 67). Baber also suggested that Woolley was lying when he said that he did not make such an explicit promise. (Baber Depo. at 69-70). However, later in her deposition when pressed on these statements, Baber backtracked and stated:

[Q]: You're going to have to have eight jurors believe you when you claim that what * * * Woolley represented to you was that all repairs to the residence did not have to be made on or before April 10th in order for [you] to receive additional replacement value. Did he say that to you?

[A]: Yes.

[Q]: He did say that to you?

[A]: He did say that because he said they would be fair in getting, considering the other things that were, so, yes, he did say that.

[Q]: He used those words?

[A]: Did he say exactly that wording, no.

[Q]: Well, paraphrase it for me. What did he tell you?

[A]: He would be fair, or the company would be fair, that they wouldn't put it in writing, but they would be fair in assessing what was being done and what was done at that time so that a decision could be made at that point in time.

(Baber Depo. at 97-98).

**D.    The promise is so ambiguous that the promisor could not reasonably expect it to induce action or forbearance.**

{¶22} Because we must construe AIA's summary-judgment evidence in a light most favorable to Baber, we assume that Woolley made a promise to Baber as depicted in Baber's deposition testimony.  Even so, AIA has produced enough evidence to demonstrate that there is no genuine issue of material fact that Woolley's promise was not clear and unambiguous—a showing that Baber has failed to rebut.

{¶23} To begin with, Woolley's promise is ambiguous on its face.  Looking only at the words of Woolley's promise, it is impossible to discern what commitment Woolley made or what OMIC would have been required to do in order to satisfy its obligation to be "fair."  "Where * * * an alleged promise is sufficiently vague or ambiguous that the parties do not have a clear understanding that a commitment has been made and, specifically, what that commitment is or requires, there is no promise to be enforced under the doctrine of promissory estoppel." *Zapata*, 2014-Ohio-5550, at ¶ 40.

{¶24} Further, Woolley's promise that OMIC would be "fair" could be interpreted in a variety of ways, including (1) that OMIC would completely waive the 180-day provision, (2) that OMIC would extend the April 10, 2018 deadline, or (3) that OMIC would pay Baber some amount of money in addition to the actual

cash value even if the farmhouse was not rebuilt within the time required by the 180-day provision. Because there are multiple reasonable interpretations of Woolley's promise that OMIC would be "fair," we cannot say that Woolley's promise was clear and unambiguous. *See Prince v. Kent State Univ.*, 10th Dist. Franklin No. 11AP-493, 2012-Ohio-1016, ¶ 42 (a promise to "waive" a required college course was not clear and unambiguous because it was open to multiple interpretations); *Casillas*, 2005-Ohio-4019, at ¶ 14-16, 21 (a provision in an employee handbook did not constitute a clear and unambiguous promise because it was subject to more than one reasonable interpretation).

{¶25} Importantly, Baber could not definitively explain what Woolley's promise that OMIC would be "fair" meant. As Baber testified in her deposition, Woolley's promise gave her "the impression" that OMIC would be flexible about the 180-day provision, and she "took" Woolley's promise to mean that the farmhouse did not need to be rebuilt by April 10, 2018, in order to receive the full policy limit of $284,000. Baber also agreed that she was "under the assumption" that OMIC was going to pay her some amount of money for the work Persinger performed even though the work was not completed by May 26, 2018. (Baber Depo. at 83). Thus, Baber's understanding of Woolley's promise appears to have been based entirely on her own interpretations and assumptions about the promise. The evidence shows Baber herself did not have a definite, fixed understanding of

Woolley's promise. Because Baber could not articulate what she understood Woolley's promise to mean, AIA could not have expected that Woolley's promise would have induced action or forbearance by Baber. *See Moellering*, 2013-Ohio-3995, at ¶ 25 (bank could not have anticipated that its statements would induce action or forbearance where statements were vague and action was based on "assumptions and conjectures"). As Woolley's promise was not the type that AIA would expect to induce action or forbearance, the promise was not clear and unambiguous. *Casillas* at ¶ 19.

**E. The factual circumstances do not explain the meaning of "fair."**

{¶26} Though Woolley's promise is facially ambiguous, Baber contends that there is a genuine dispute as to the meaning of the promise when the facts and circumstances surrounding the promise are considered together with the words of the promise. Baber identifies a number of facts and circumstances that supposedly inform the meaning of Woolley's promise, including that Woolley made his promise to her directly, rather than through a communication addressed to all of AIA's customers. In addition, Baber notes that she had a longstanding relationship with AIA, that she trusted Woolley, that Woolley characterized himself as "an advocate for AIA's customers," and that AIA's customers rely on Woolley's advice. She also notes that when Woolley promised OMIC would be "fair," she was relying almost exclusively on AIA due to Wente's failure to respond timely to her inquiries.

Further, Baber points to "the treacherous weather conditions" and to the fact that OMIC had been "very fair" to her in resolving previous insurance claims. Baber claims these surrounding facts and circumstances supply necessary context for Woolley's promise, in light of which the meaning of Woolley's promise is arguably clear and unambiguous.

{¶27} While the facts and circumstances under which a promise is made might clarify the meaning of a seemingly ambiguous promise in a different case, the facts and circumstances highlighted by Baber do not illuminate the meaning of the promise in this particular case. For example, we cannot find anything in the history of Baber's relationship with AIA, Woolley, and OMIC, as reflected in the summary-judgment evidence, that renders Woolley's promise any clearer. According to Baber, the farmhouse had been insured through policies obtained by AIA for over 20 years. (Baber Depo. at 17-18). However, for much of this time, it was Baber's late ex-husband, rather than Baber, who handled insurance matters. (Baber Depo. at 17, 19). Only in the five years prior to the fire did Baber deal directly with AIA. On these occasions, she would typically call AIA with whatever questions she had about her homeowners and automobile insurance policies. (Baber Depo. at 19-21). When Baber called AIA with insurance-related questions, AIA "[s]atisfied whatever questions [she] had" in a helpful, friendly, and professional manner. (Baber Depo. at 21). Baber's experiences with AIA appeared consistent with Woolley's

characterization of AIA as an "advocate" for its clients, who "normally" rely on advice needed to buy an insurance policy. (*See* Woolley Depo. at 10-11, 13).

{¶28} However, when it came to the actual adjustment of insurance claims, AIA assumed a less prominent role. For instance, Baber testified she submitted two claims under her homeowner's insurance between 2012 and October 2017. Baber believed the first claim was submitted sometime in 2013 after her garage caught fire when it was struck by lightning. (Baber Depo. at 22-23). Baber reported the fire to AIA, after which OMIC "took care of adjustment of the particular claim." (Baber Depo. at 23). Baber thought OMIC was "very fair" in resolving this claim, and there is no indication AIA intervened to help achieve this outcome. (*See* Baber Depo. at 23). The second insurance claim was submitted after a tree fell on her roof. (Baber Depo. at 23-24). As with the first claim, Baber reported the incident to AIA, which referred her to OMIC. (*See* Baber Depo. at 24). She then dealt directly with OMIC regarding adjustment of this claim. With respect to these claims, Baber testified an adjuster from OMIC reviewed the policy in detail with her. (Baber Depo. at 25-26). Thus, as far as can be discerned from the record before us, AIA was little more than an intermediary between Baber and OMIC during the claims-adjustment process. Indeed, AIA's apparent involvement with Baber's two prior insurance claims is in accord with Woolley's description of AIA's involvement in the claims-adjustment process generally:

> We don't answer claim questions as far as getting into the details of what's covered, the intricacies of the policy. That's the claim adjuster's job or the claim department, if they have questions above the adjuster level. That's one thing that's hammered to us as agents, support the client however you can; but if there's questions of coverage, you have to defer to the claim adjuster.

(Woolley Depo. at 26).

{¶29} With respect to the claims-adjustment process following the October 2017 fire, the evidence supports that, notwithstanding Woolley's promise that OMIC would be "fair," AIA again acted largely as an intermediary between Baber and OMIC. After Baber's claim was submitted to OMIC, Wente was assigned as the claims adjuster. On occasions, Wente failed to promptly respond to Baber's inquiries, and Baber would call AIA and voice her displeasure to Woolley. (Baber Depo. at 29). Woolley would, in turn, reach out to Wente and request that Wente contact Baber. (Baber Depo. at 29-30); (Woolley Depo. at 28-29, 39). Thus, although Baber contacted Woolley often throughout the claims-adjustment process, the evidence indicates Woolley consistently directed Baber to Wente and helped to facilitate this direct communication. Other than facilitating these communications, there is no evidence in the record that AIA had any involvement in the claims-adjustment process.

{¶30} It is undisputed that, during the early stages of the claims-adjustment process, Wente repeatedly failed to respond to Baber's inquiries, even on some occasions when Woolley and AIA had intervened on Baber's behalf. Yet, the

claims-adjustment process did not stop during this period. Baber testified she received a number of letters from Wente. (Baber Depo. at 36, 87-88). Throughout October, November, and December 2017, Baber received multiple checks from OMIC to pay for temporary hotel lodging, rental housing, and cleaning costs, among other things. (Baber Depo. at 31-33). In addition, although Baber did not receive OMIC's estimate until mid-December 2017, the estimate was being completed during this time, along with an engineering survey evaluating the structural integrity of the surviving parts of the farmhouse. (Baber Depo. at 54-56).

{¶31} Furthermore, as Baber herself acknowledged, communication with Wente "got a lot better at the end than they were earlier with her." (Baber Depo. at 81). The evidence establishes that in 2018, after Woolley had promised that OMIC would be "fair," Baber talked directly with Wente about the 180-day provision. According to Baber, during one of these conversations, she told Wente that Woolley told her OMIC would be "fair in assessing what was being done and what was done at that time so that a decision could be made at that point in time." (Baber Depo. at 95, 98). When asked what Wente's response was to this statement, Baber testified: "I think she just said, well, we'll see. I didn't really get answers from her very much, so I assume that's what – I assume that's the answer that she gave." (Baber Depo. at 98-99). Baber admitted she and Wente had at least one conversation

wherein Wente expressed she was considering extending the April 10, 2018 deadline. (Baber Depo. at 72).

{¶32} Finally, after Baber learned that the April 10, 2018 deadline had been extended, she and Wente discussed a completion date. Baber informed Wente that Persinger would not be able to complete the work by the new May 26, 2018 deadline. (Baber Depo. at 81). Baber testified Wente "pushed" for a projected completion date and asked whether Baber had talked with Persinger about the time necessary to rebuild the farmhouse. (Baber Depo. at 81). Although Wente told Baber that a firm completion date was "important," Baber chose not to pursue the matter with Persinger. (Baber Depo. at 91). Baber told Wente that she had not talked to Persinger about a firm completion date "at [that] point because there's a tremendous amount to do and * * * weather is a big factor." (Baber Depo. at 81). When Baber failed to provide a projected completion date and told Wente that Persinger could not finish by May 26, 2018, Wente responded that May 26, 2018, was "the date." (Baber Depo. at 82).

{¶33} After reviewing the evidence presented in favor of the motion for summary judgment, several facts and circumstances are evident. While an extensive relationship between Baber's deceased ex-husband and AIA may have existed, the relationship between Baber and AIA had only been in existence for five years prior to the fire. During this period, Baber made two property insurance claims. In both

instances, she initially contacted AIA to make the claims, after which subsequent contacts were directly between Baber and OMIC's adjuster. In the instant case, other issues relating to the fire claim, such as payment for temporary housing and cleaning, were addressed through Wente and timely handled by OMIC. Even after the deadline to complete the rebuild had passed, OMIC held open other aspects of the claim, such as payment for loss of personal items and housewares. The procedure employed by AIA was to direct all inquiries about a claim to the adjuster. Woolley followed this policy by contacting Wente and asking her to respond to Baber on the occasions when Baber complained about a delay in communications.

{¶34} As illustrated by the preceding discussion, AIA submitted enough evidence in support of its motion for summary judgment to give this court an adequate understanding of the context in which Woolley's promise was made. This context, insofar as it is discernible from the record before us, does not clarify Woolley's promise. In response to AIA's motion for summary judgment, Baber did not introduce any evidence from which we could develop a more complete understanding of the context in which the promise was made. That is, Baber presented no evidence of her own that creates a genuine issue as to whether Woolley's promise was clear and unambiguous in light of the context in which it was made. *See* Civ.R. 56(E). Simply stated, Baber has not identified anything that would narrow the range of possible meanings of Woolley's promise.

{¶35} In sum, AIA carried its burden of producing evidence that, when viewed in a light most favorable to Baber, demonstrates the absence of a genuine issue of material fact. Even assuming Woolley promised Baber that OMIC would be "fair," the meaning of this promise is wholly ambiguous. Baber failed to rebut AIA's showing with specific facts establishing the existence of a genuine issue of material fact. Because reasonable minds could only conclude that Woolley did not make a clear and unambiguous promise, AIA is entitled to judgment as a matter of law on Baber's promissory-estoppel claim. Therefore, we conclude the trial court did not err by granting AIA's motion for summary judgment.

## IV. Conclusion

{¶36} For the foregoing reasons, Baber's sole assignment of error is overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Shelby County Court of Common Pleas.

***Judgment Affirmed***

**WILLAMOWSKI, P.J., concurs.**

**SHAW, J., concurs in Judgment Only.**

**/jlr**