JOURNAL ENTRY and OPINION
{¶ 1} Plaintiffs-appellants Ludmilla, Alexander, and Eugene Dzambasow ("the Dzambasows") appeal the trial court's decision granting summary judgment in favor of defendant-appellee Georg Abakumov ("Abakumov"). Finding merit to their appeal, we reverse and remand.
 {¶ 2} The record reveals the following facts. In 2001, Ludmilla and Alexander Dzambasow hired Abakumov to defend their son, Eugene, in a domestic violence case in Rocky River Municipal Court, Case No. 01CRB1879, and in a felonious assault case in Cuyahoga County Common Pleas Court, Case No. CR-409512. Abakumov in turn hired attorney Jerry Emoff ("Emoff") as co-counsel in both cases.[1]
 {¶ 3} In August 2001, at the initial meeting, Alexander and Larissa Loukach, Eugene's girlfriend and co-defendant in the felonious assault case, signed a legal fee agreement that stated that Abakumov would represent Eugene in the domestic violence case for $250 an hour plus a $10,000 non-refundable retainer.[2] The Dzambasows thought the agreement they made with Abakumov provided that they would pay the attorney $10,000 to represent Eugene in both of his cases as well as Larissa in her felonious assault case. Three days later, Abakumov demanded that the Dzambasows pay him an additional $5,000.
 {¶ 4} The next month, Abakumov informed the family he needed more money. On September 9, 2001, Ludmilla and Alexander signed a "legal fee agreement" with Abakumov to defend Eugene in the Cuyahoga County case. As part of the contract, they agreed to pay Abakumov an additional $35,000, for a total of $50,000.[3]
 {¶ 5} Emoff made all the court appearances in the felonious assault case.[4] On September 19, 2001, less than three weeks after the Dzambasows hired Abakumov to represent their son, Eugene pled guilty to aggravated assault in the common pleas court and was immediately sentenced to six months in prison.[5]
 {¶ 6} In February 2002, Eugene was released from prison and transported to Rocky River Municipal Court for a bond hearing in his domestic violence case. Abakumov was present at the hearing, and Ludmilla posted Eugene's bond. Abakumov and Emoff were both present when Eugene pled no contest to the amended charge of disorderly conduct on March 14, 2002.
 {¶ 7} Four days after the plea, the Dzambasows filed a grievance with the Cleveland Bar Association, arguing that Abakumov was negligent in his representation, misled the family, failed to keep promises, was unethical, and used undue pressure on the family by forcing them to pay him additional money to represent Eugene and Larissa. The Cleveland Bar Association investigated the allegations and found no ethical violation. The Dzambasows appealed to the Ohio Supreme Court's disciplinary counsel, which also found no ethical violation.
 {¶ 8} On April 10, 2002, Eugene received a notice to appear in Rocky River Municipal Court for a review of the magistrate's recommendation to accept his plea agreement. On the same day, Abakumov moved for a continuance of the hearing. The motion stated in pertinent part:
"Now comes the undersigned counsel for defendant and moves this honorable Court to continue the hearing. * * * Defendant has filed a complaint against counsel with the Cleveland Bar Association. * * * Although client has contacted undersigned counsel to represent him at this hearing, counsel needs to clarify the legal issues surrounding continued representation of defendant with the Cleveland Bar Association prior to further representation to avoid an ethical violation in this regard."
 {¶ 9} On April 24, 2002, Emoff faxed a letter to Eugene, informing him that Emoff would no longer represent him; two days later, the attorney formally withdrew from the Rocky River Municipal Court case. On April 30, 2002, Abakumov formally withdrew his representation of Eugene. The review hearing was held in May 2002, at which Eugene represented himself.
 {¶ 10} On April 17, 2003, the Dzambasows filed a lawsuit against Abakumov alleging breach of contract, fraud, rescission, and unjust enrichment stemming from the attorney's representation of Eugene in the felonious assault case.
 {¶ 11} The court referred the case to mediation, but attempts to settle the case were unsuccessful. Abakumov filed a motion for summary judgment, arguing that the statute of limitations to file a complaint for legal malpractice had expired. The trial court granted Abakumov's motion, ruling as follows:
"Georg Abakumov Defendant's Motion for Summary Judgment * * * is granted. The court finds that the cause of action in this case is one of legal malpractice, and as such, is subject to the one year statute of limitations pursuant to O.R.C. 2305.11(A). The court further finds that the filing of the grievance against the defendant triggered the statute of limitations. In this case, the court finds that the grievance was filed on March 18, 2002. Plaintiffs did not file this cause of action for legal malpractice until April 17, 2003, approximately one month after the statute of limitations had run out. The court, therefore, finds defendant's motion for summary judgment well taken. As such, defendant's motion for summary judgment is granted. * * *"
 {¶ 12} The Dzambasows filed this appeal, raising the following assignment of error:
"The lower court erred in granting defendant's motion for summary judgment pursuant to Ohio Rule of Civil Procedure 56(C) governing summary judgment."
 {¶ 13} This court reviews the lower court's granting of summary judgment de novo. Druso v. Bank One of Columbus (1997),124 Ohio App.3d 125, 131, 705 N.E.2d 717; Brown v. Scioto Bd. ofCommrs. (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153.
 {¶ 14} The Ohio Supreme Court has established that summary judgment under Civ.R. 56 is proper when:
"(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made."
State ex rel. Parsons v. Fleming (1994), 68 Ohio St.3d 509,511, 628 N.E.2d 1377; Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327, 364 N.E.2d 267. The party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists for trial. Celotex Corp. v. Catrett
(1987), 477 U.S. 317, 330, 91 L.Ed.2d 265, 106 S.Ct. 2548;Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, 115,526 N.E.2d 798. Any doubts must be resolved in favor of the nonmoving party.Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 358-359,604 N.E.2d 138. There is no issue for trial, however, unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby,Inc. (1986), 477 U.S. 242, 249-250, 91 L.Ed.2d 202,106 S.Ct. 2505.
 {¶ 15} The Dzambasows argue that their lawsuit is not a claim for legal malpractice. In the alternative, they argue that even if it is a legal malpractice claim, there is sufficient evidence to establish that a genuine issue of fact exists as to which event triggered the running of the statute of limitations.
 {¶ 16} We first address the issue of whether the complaint filed on April 17, 2003, is a claim for legal malpractice. Abakumov argues that the Dzambasows' complaint alleges legal malpractice. We disagree.
 {¶ 17} It is well-established that "an action against one's attorney for damages resulting from the manner in which the attorney represented the client constitutes an action for malpractice within the meaning of R.C. 2305.11, regardless of whether predicated upon contract or tort or whether for indemnification or for direct damages." Leski v. Ricotta,
Cuyahoga App. No. 83600, 2004-Ohio-2860, citing, Muir v. HadlerReal Estate Management Co. (1982), 4 Ohio App.3d 89, 90,446 N.E.2d 820. "In Ohio, the applicable statute of limitations is determined not from the form of pleading or procedure, but from the gist of the complaint." Id., citing, Hibbett v. Cincinnati
(1982), 4 Ohio App.3d 128, 131, 446 N.E.2d 832. "Malpractice by any other name still constitutes malpractice." Muir, supra at 90.
 {¶ 18} Here, the Dzambasows filed breach of contract, fraud, rescission, and unjust enrichment claims against Abakumov. The gist of their complaint does not involve the manner in which Abakumov represented his client Eugene. Rather, the Dzambasows complain that Abakumov entered into a contract with them, charged excessive fees, charged a nonrefundable retainer, and failed to provide substantial legal services. The complaint does not involve any allegation that Abakumov exercised any legal judgment on their behalf or neglected a legal matter they entrusted to him.
 {¶ 19} Therefore, we find that the complaint is not one for legal malpractice and, thus, summary judgment was improperly granted.
 {¶ 20} Secondly, the Dzambasows argue that even if the complaint alleged legal malpractice, they filed the lawsuit within the statute of limitations. We agree to the extent that we find that the date the statute of limitations expired is in dispute and thus an issue of fact to be determined by a jury.
 {¶ 21} The statute of limitations for an action for legal malpractice is one year. R.C. 2305.11(A). The Ohio Supreme Court has developed a two-prong test to determine what causes the one-year period to begin to run. An action for legal malpractice accrues and the statute of limitations begins to run when either: 1) a cognizable event occurs whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice as to the need to pursue possible remedies against the attorney, or 2) when the attorney-client relationship for that particular transaction or undertaking terminates. Zimmie v. Calfee, Halter Griswold (1989), 43 Ohio St.3d 54, 538 N.E.2d 398, at syllabus, citing, Omni-Food Fashion, Inc. v. Smith (1988),38 Ohio St.3d 385, 528 N.E. 2d 941. The court must consider both the date of discovery ("the discovery prong") and the date of termination, and then base its decision on which event occurs later. See, e.g., Zimmie, supra. Therefore, since the Dzambasows' complaint was filed on April 17, 2003, the discovery date or the termination date would have to be on or after April 17, 2002, for the complaint to be timely filed.
 {¶ 22} Regarding the discovery date, a "cognizable event" is an event sufficient to alert a reasonable person that his or her attorney committed an improper act in the court of legal representation. Wozniak v. Tonidandel (1997),121 Ohio App.3d 221, 699 N.E.2d 555; Spencer v. McGill (1993),87 Ohio App.3d 267, 622 N.E.2d 7. In determining the cognizable event, "the focus should be on what the client was aware of and not an extrinsic judicial determination." Vagianos v. Halpern (Dec. 14, 2000), Cuyahoga App. No. 76408, citing McDade v. Spencer
(1991), 75 Ohio App.3d 639, 600 N.E.2d 371. The Ohio Supreme Court explained in Omni-Food Fashion, supra at syllabus, that:
"[f]or the purposes of determining the accrual date of R.C.2305.11(A) in a legal malpractice action, the trial court must explore the particular facts of the action and make the following determinations: when the injured party became aware, or should have become aware, of the extent and seriousness of his or her alleged legal problem; whether the injured party was aware, or should have been aware, that the damage or injury alleged was related to a specific legal transaction or undertaking previously rendered him or her; and whether such damage or injury would put a reasonable person on notice of the need for further inquiry as to the cause of such damage or injury."
 {¶ 23} Abakumov argues that the cognizable event was when Emoff appeared at the first pretrial because the family was then "on notice" that he had hired co-counsel. A review of the record shows that many incidents in the long and complicated professional relationship could qualify as cognizable events sufficient to satisfy the discovery prong. The initial appearance of Emoff, the payment of $50,000 to Abakumov, Abakumov and Emoff's failure to represent Larissa, or, at the very latest, the filing of the bar grievance, could qualify as the cognizable event. All of these events occurred more than a year before the Dzambasows filed suit against Abakumov. The first prong of theZimmie test is easily satisfied; therefore, it is unnecessary for this court to determine which event triggered the statute of limitations under the discovery prong of Zimmie.
 {¶ 24} Zimmie requires us to next consider when the attorney-client relationship terminated. If the attorney-client relationship terminated after the cognizable event occurred, we must consider the termination date as the date the statute of limitations began to run.
 {¶ 25} Abakumov asks this court to ignore his representation of Eugene in the domestic violence case because the Dzambasows' complaint did not mention the domestic violence case.
 {¶ 26} Pursuant to Civ.R. 56(C), the court may consider pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact when deciding a motion for summary judgment. Other types of documents may be introduced as evidentiary material only through incorporation by reference in a properly framed affidavit. Lance Acceptance Corp. v. Claudio, Lorain App. No. 02CA008201, 2003-Ohio-3503, citing Martin v. CentralOhio Transit Auth. (1990), 70 Ohio App.3d 83, 590 N.E.2d 411.
 {¶ 27} A review of the record in this case shows that some documents may not have been properly sworn or authenticated. However, "if the opposing party fails to object to improperly introduced evidentiary materials, the trial court may, in its sound discretion, consider those materials in ruling on the summary judgment motion." Christe v. GMS Mgt. Co., Inc. (1997),124 Ohio App.3d 84, 90, 705 N.E.2d 691. We find that Abakumov did not object to any of the documents in the record. Therefore, since we review this case de novo, we will consider all those documents covered by Civ.R. 56(C) in making our decision, not just the complaint.[6]
 {¶ 28} Although the issue of when a malpractice action accrues is a question of law to be determined by the court, the question of when an attorney-client relationship terminates is one of fact. See A.G. Financial, Inc. v. Lasalla, Cuyahoga App. No. 84880, 2005-Ohio-1504; Omni-Food Fashion, supra at 388. Because this is an appeal from a summary judgment, we must follow Civ.R. 56(C) and determine whether, based on all the evidence and stipulations, "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor." We cannot find that reasonable minds would come to one conclusion; therefore, we find that a genuine issue of material fact exists as to when the Dzambasows and Abakumov terminated their attorney-client relationship. Accordingly, summary judgment was improperly granted.
 {¶ 29} Abakumov argues his representation of Eugene in the felonious assault and the domestic violence cases are two separate transactions or undertakings; therefore, his service ended in September 2001 when Eugene pled guilty to aggravated assault. Abakumov bases his argument on the fact that the family signed a separate contract for each case; therefore, he claims he was hired for two separate transactions. We find ample evidence in the record, however, that Abakumov was hired to defend Eugene in one undertaking or transaction and that representation lasted long after September 2001.
 {¶ 30} In their affidavits, the Dzambasows argue that they hired Abakumov to defend Eugene in both cases and thought that they had only one contract with him, which was executed on September 7, 2001. Alexander avers that the document he signed in August 2001, that he later discovered was a "contract," was intended to simply grant permission to Abakumov to begin working on Eugene's defense. At this point, the Dzambasows thought that they would pay Abakumov $10,000 for representation of both Eugene and Larissa. Alexander further argues that the family did not become aware of the August "contract" until their current attorney informed them of its existence.
 {¶ 31} Additionally, in his February 25, 2002, letter to Eugene, Abakumov acknowledged that he represented Eugene in both cases. In a subsequent letter to Ludmilla, Abakumov wrote that he was representing Eugene in both cases and had hired Emoff for assistance. Most telling is that the letter reveals that Abakumov was commingling the funds he received from the Dzambasows to serve as payments for both cases.[7] Therefore, we find that there is a genuine issue of fact whether the two cases constitute one continuous representation or two separate transactions.
 {¶ 32} In the alternative, Abakumov claims that the termination date is the date the Dzambasows filed their bar grievance. Abakumov relies on Brown v. Johnstone (1982),5 Ohio App.3d 165, 450 N.E.2d 693, and Erickson v. Misny (May 9, 1996), Cuyahoga App. No. 69213, to advance his argument that filing a bar grievance terminates an attorney-client relationship because the filing evidences a lack of trust and confidence a client has in his attorney. In Brown, supra at 167, the court held that the initiation of grievance proceedings before the local bar association demonstrated the client's loss of confidence in his attorney and was sufficient to indicate termination of the relationship. The court found a termination of the relationship notwithstanding the fact that the client thought the defendant remained his attorney. Id. In Erickson, supra, this court held that the trial court did not err in finding that the statute of limitations began to run on the date the bar grievance was filed.
 {¶ 33} However, we find Erickson easily distinguishable because the client therein had already retained new counsel when he filed the bar grievance. Moreover, the bar grievance contained a sworn statement that the client had already terminated the relationship with his attorney. Id. In the instant case, the evidence shows that the Dzambasows thought that they had signed a single contract for Eugene's representation and their affidavits establish that they thought Abakumov continued to represent their son long after the completion of the felonious assault case in common pleas court. Contrary to Abakumov's arguments, the evidence suggests that the Dzambasows would not have fired Abakumov prior to the completion of the domestic violence case because they had already paid him $50,000 to defend Eugene and they lacked funds to retain other counsel.
 {¶ 34} Brown, supra, is also distinguishable because the client had no further contact with his attorney after he filed the bar grievance. Further, the bar association sent the client a letter stating he should seek other counsel. Id. Here, Abakumov had further contact with the Dzambasows. Abakumov filed a motion in Eugene's domestic violence case, which demonstrates that the attorney was contemplating further representation of his client. Although Eugene entered a plea in March 2002, his domestic violence case was not final because he had a review hearing scheduled in April, and the record shows that he thought his attorney would represent him at that hearing.
 {¶ 35} Brown was recently distinguished in R.E. HollandExcavating, Inc. v. Martin, et al., 162 Ohio App.3d 471,2005-Ohio-3662, 833 N.E.2d 1273. In R.E. Holland, the court held that a lack of trust and confidence between attorney and client does not necessarily constitute the termination of the relationship for purposes of determining the commencement of the statute of limitations. The court noted that the distinction inBrown was that the representation had concluded and the filing of a bar grievance had already resulted in a reprimand. That reprimand, the court noted, required a holding as a matter of law that the professional relationship ended on the date of reprimand. R.E. Holland, supra. In R.E. Holland, the court found that the litigation was not complete because there remained a legal proceeding in which reasonable minds might find the attorney still represented the client. Id. at 1277. In R.E.Holland, the legal proceeding was the drafting of a dismissal entry. In this case, Eugene still needed representation at his review hearing in the municipal court.
 {¶ 36} The R.E. Holland court also noted that the client was not aware that the attorney had withdrawn as counsel until he became aware of the entry granting the attorney's motion to withdraw as counsel. Although we noted in Erickson, supra, that a formal withdrawal is not necessary to terminate a relationship, the Dzambasows likewise contend that they did not know that Abakumov no longer represented Eugene until they learned that he had filed a motion to withdraw. Unlike Emoff, Abakumov did not communicate his position to the family by letter. Abakumov formally remained Eugene's attorney until April 30, 2002, approximately six weeks after he became aware of the bar grievance.
 {¶ 37} We note that the client in R.E. Holland did not file a grievance with the bar. However, both R.E. Holland andBrown considered the impact a loss of trust and confidence between an attorney and client has on the professional relationship. We agree with R.E. Holland that a lack of trust and confidence between the parties does not necessarily terminate the attorney-client relationship.
 {¶ 38} In Monastra v. D'Amore (1996), 111 Ohio App.3d 296,676 N.E.2d 132, we held that the trial court erred in entering summary judgment because there was a genuine issue of material fact regarding when the attorney-client relationship terminated. In Monastra, the attorney sent a termination letter to his client but failed to turn over his client's files. The attorney also continued to do work for the client and waited a month to formally withdraw his representation. We found that these delays hindered the discovery of malpractice; therefore, the discharge letter was only one facet of the termination. Id. at 303-304.
 {¶ 39} We cannot ignore the evidence in the record demonstrating that Abakumov continued to represent Eugene. It is unclear from the record whether the Dzambasows thought the relationship with Abakumov was terminated when they filed the bar grievance. However, by sending Eugene a copy of the motion to continue the review hearing, Abakumov in effect advised the family that he was still involved in Eugene's case. Moreover, the Dzambasows argue that they had no knowledge that Abakumov was going to terminate the relationship until after he formally withdrew his representation.[8]
 {¶ 40} There is also evidence that Abakumov delayed turning over Eugene's files. Abakumov continued to do work on Eugene's behalf and waited approximately six weeks after receiving the bar grievance to file a motion to formally withdraw.
 {¶ 41} Additionally, we note that Abakumov's co-counsel, Emoff, made the majority of the court appearances for both cases. Emoff did not formally withdraw as Eugene's counsel until April 26, 2002; therefore, the Dzambasows could reasonably believe that Abakumov and Emoff continued to represent Eugene after they filed their bar grievance.
 {¶ 42} We acknowledge that this court has held that the filing of a bar grievance terminated the attorney-client relationship and that the professional relationship may terminate prior to the attorney formally notifying the court. Brown,
supra; Erickson, supra. However, these events are only facets of termination.
 {¶ 43} Whether the filing of a bar grievance necessarily terminates the relationship is an issue of fact. Based on the totality of the circumstances surrounding this case, we cannot say that the Dzambasows' and Abakumov's relationship was terminated when the bar grievance was filed. One who is unsuspecting and untrained in the law could reasonably believe that the function of a grievance or bar complaint would simply be to enlist the bar association's help in obtaining a full accounting from an attorney. See Brown, supra (dissent by Hofstetter). The Dzambasows filed their bar complaint themselves, without the benefit of an attorney, Eugene's case file, or a full accounting of how their $50,000 was spent. They requested Eugene's case file in February 2002, but did not receive it until October 2002, and only after the Ohio Supreme Court's Disciplinary Counsel intervened. Morever, as Ludmilla averred in her affidavit, the Dzambasows had been friends of Abakumov's for over forty years, and they trusted him to fairly represent their son.
 {¶ 44} We find that the affidavits submitted on behalf of the parties create conflicting facts from which reasonable minds could draw different conclusions as to the scope and duration of Abakumov's legal services.
 {¶ 45} We further find that, although the filing of a bar grievance may constitute termination of the attorney-client relationship, the mere filing of a grievance does not constitute a per se termination of the professional relationship. We hold, in this case, that there is a genuine issue as to the date on which the attorney-client relationship concluded.
 {¶ 46} Therefore, the sole assignment of error is sustained.
 {¶ 47} Accordingly, we reverse the granting of summary judgment and remand for proceedings consistent with this opinion.
It is, therefore, considered that said appellants recover of said appellee the costs herein.
It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Gallagher, J. and Corrigan, J. concur in judgment only.
[1] Emoff is not a party to this appeal.
[2] The Dzambasows argue that the "legal fee agreement" did not specify the terms of the representation because the handwritten portions were blank when Alexander and Larissa signed the document. The family further argues that they did not know the agreement was a contract and thought that the document was only a document allowing Abakumov to represent Eugene and Larissa.
[3] The Dzambasows argue that the contract they signed in September is the only contract of which they had any knowledge and they thought the contract was for representation of Eugene and Larissa.
[4] The record shows that Abakumov paid Emoff $7,000 for his services.
[5] The Dzambasows allege that Abakumov told them that a public defender should represent Larissa. Neither Abakumov nor Emoff ever entered an appearance for Larissa.
[6] Evidence offered by affidavit in support of or in opposition to a motion for summary judgment must also be admissible at trial in order for the court to rely on it. Felkerv. Schwenke (1998), 129 Ohio App.3d 427, 431, 717 N.E.2d 1165. Some of the parties' affidavits contain hearsay statements. Even if we strike any questionable statements, the affidavits contain evidence sufficient to raise the issue of whether Abakumov was still representing Eugene in April 2002.
[7] One of the Dzambasows' main complaints is that Abakumov never provided them with a full accounting of how their money was spent.
[8] The record shows that there was some confusion regarding the review hearing. It appears that the family believed Eugene's case was over when he pled in March. When they received the notice from the court, they contacted Abakumov. Ludmilla stated in her affidavit that Abakumov then told her that he would no longer represent Eugene. However, the family argues that they still thought that Abakumov or Emoff would represent Eugene at the hearing. It is not in this court's province to determine which party is more credible.