[Cite as *Jacobs v. Sandusky Register*, 2024-Ohio-5422.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Matthew Jacobs

    Appellant

v.

Sandusky Register, et al.

    Appellees

Court of Appeals No.  E-24-006

Trial Court No.  2022 CV 0097


**DECISION AND JUDGMENT**

Decided:  November 15, 2024

* * * * *

Richard M. Kerger, for appellant.

David L. Marburger, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Plaintiff-appellant, Matthew Jacobs, appeals the January 2, 2024 judgment of the Erie County Court of Common Pleas, granting summary judgment in favor of defendants-appellees, Matt Westerhold, and Ogden News Publishing of Ohio, Inc. (aka the Sandusky Register) (collectively, "the defendants").  For the following reasons, we affirm the trial court judgment.

**{¶ 2}** Also before the court is Jacob's motion to supplement the record with the transcript of the deposition of Matt Westerhold.  Jacobs cited the deposition transcript in his brief opposing summary judgment, but according to the trial court docket, did not file the transcript or excerpts of the transcript in the trial court.  For the reasons described below, we deny Jacob's motion.

## II.  Background

**{¶ 3}** Matthew Jacobs is the sole detective for the city of Huron and was a part-time wrestling coach for Huron City Schools.  Ogden News Publishing of Ohio, Inc. owns the Sandusky Register newspaper, and Matt Westerhold is the paper's managing editor.

**{¶ 4}** Jacobs filed a complaint for libel against Ogden, the Sandusky Register, and Westerhold.  According to Jacobs's complaint, in the spring of 2019, two 13-year-old girls (Jane Doe 1 and Jane Doe 2) alleged that a male classmate (John Doe) sent them photos of penises.  Jane Doe 1's father contacted Jacobs for advice how to handle the incident.  Jacobs told him they could (1) file a criminal complaint, or (2) try to resolve the matter with John Doe's family.  Jane Doe 1's father told Jacobs that he would attempt the second option.  Jacobs became concerned that Jane Doe's family could be subject to criminal sanctions if these photos remained on the girl's phone, so he told Jane Doe 1's father that if they elected not to pursue criminal charges, they should destroy the photographs.

2.

{¶ 5} Soon after speaking with Jane Doe 1's father, Jane Doe 2's parents contacted Jacobs and said that they wished to pursue a criminal complaint. He told them that they should come in to file the report. At some point, Jacobs told both families that he coaches John Doe and knows his family, but he assured them that he could be fair and impartial in handling the matter. He alleged that neither family objected.

{¶ 6} Jacobs claimed in his complaint that he thoroughly investigated the girls' accusations, conducted interviews, reviewed the photographs, and with the recommendation of the police chief, turned the investigation over to the Erie County Juvenile Prosecutor, who filed charges. While the matter was being investigated, new charges surfaced that John Doe had nonconsensual sexual contact with one of the girls. Jacobs investigated a possible charge for gross sexual imposition, but he did not file the charge because he concluded that no probable cause existed. The prosecutor disagreed and a new complaint was filed. John Doe eventually entered into a plea agreement.

{¶ 7} While these issues were developing, news stories were published in the Sandusky Register. Jacobs alleged that Westerhold was "unrelenting in his efforts to obtain and report information." He claimed that Westerhold obtained a copy of the investigation "that contained answers to many of the questions which were being presented in the Defendant Newspaper as unanswered," but "no effort was made to furnish those answers in any news article." Instead, Jacobs alleged, the newspaper repeatedly reported the allegations contained in civil suits filed by the families and printed that Jacobs had "mishandled" the investigation "despite the fact that no one was

3.

ever able to point to any way in which that had occurred." Jacobs claimed that on August 15, 2021, the defendants "made the statement of fact that [Jacobs] had mishandled the investigation"—a statement that Jacobs claimed was false. He alleged that the false statement constituted libel per se because the statement damaged him professionally.

{¶ 8} The defendants moved to dismiss the claim. The trial court denied the motion, and an answer was filed. The defendants later filed a motion for summary judgment, attaching the Jane Doe families' complaints and the August 15, 2021 article referenced by Jacobs.

{¶ 9} The defendants argued that R.C. 2317.05—Ohio's statutory fair report privilege—protects press accounts that summarize allegations in civil pleadings where the account is impartial and substantially accurate and it was not published maliciously. They maintained that the privilege protects the newspaper article at issue here. They also claimed that the challenged statement—summarizing the Jane Doe families' allegations as claiming that Jacobs "mishandled" the investigation—was an expression of an opinion and was inactionable.

{¶ 10} Jacobs sought a continuance under Civ.R. 56(F) so that he could conduct additional discovery. He ultimately deposed Westerhold, then filed his brief in opposition to the motion for summary judgment.

{¶ 11} Jacobs recognized that "statements in civil pleadings have an absolute privilege," and "under the litigation privilege doctrine, a newspaper publishing [a report about a civil suit] has no liability, at least according to the Defendant." He conceded that

4.

the statements were not published maliciously. But Jacobs argued that the defendants did not act impartially when they published the August 15, 2021 article, given that the newspaper interviewed the Jane Doe families but not Jacobs. He disagreed that the article reported the defendants' opinions, and maintained that the article did not merely quote the civil complaint, but instead asserted as fact that Jacobs had mishandled the investigation.

{¶ 12} In support of his position, Jacobs pointed to Westerhold's deposition testimony where he explained that the paper publishes editorials when it has an opinion about a problem in the community warranting the newspaper's attention, and denied that the newspaper had an obligation to determine the accuracy of an allegation in a lawsuit before reporting it. Westerhold testified that he never met Jacobs, did not interview him or ask any reporter to do so, had no reason for not interviewing him, and did not know that statements contained in civil litigation are absolutely privileged. He said that he assumed that the police chief knew he could call Westerhold, the editorial board did not discuss whether the families' concerns were valid, and he believed that if someone said something in a lawsuit, he could report it without checking to be sure that it is accurate.

{¶ 13} Jacobs responded in his opposition brief that John Doe's family initiated a lawsuit against the newspaper, and as part of the settlement of that action, the newspaper agreed to withdraw from its website 15 articles, listed in an exhibit that was used at Westerhold's deposition. Westerhold testified that he did not know the context of the

5.

agreement to withdraw the articles, but he agreed that it is unusual for stories to be withdrawn.

{¶ 14} In a judgment journalized January 2, 2024, the trial court granted summary judgment to the defendants. The court quoted at length from the August 15, 2021 article. It also summarized paragraph-by-paragraph the Jane Doe families' complaints as they relate to Jacobs's conduct. The court explained that there were two potentially-applicable privileges that the defendants could assert—(1) the privilege set forth in R.C. 2317.05, and (2) the common-law privilege of neutral reporting—both of which are affirmative defenses that defendants must prove by a preponderance of the evidence by showing that the statements in the August 15, 2021 article were substantially accurate. It found that "[w]hether or not the statements contained in the article of August 15, 2021, were 'substantially accurate' is a question of law, event (sic) though the establishment of the two privileges set forth above calls for a factual determination of whether or not the article sets forth a substantially accurate account of the two lawsuits filed against Mr. Jacobs, as well as other defendants."

{¶ 15} The court concluded that the statements made in the August 15, 2021 article were substantially accurate, therefore, under both R.C. 2317.05 and the common law, the defendants were privileged to publish them. It agreed with Jacobs that the statements were defamatory, but it observed that the article reported *not* that Jacobs had mishandled the investigation, but that the Jane Doe families' lawsuits *alleged* that Jacobs mishandled the investigation.

6.

{¶ 16} The trial court disagreed with the defendants that the privilege set forth in R.C. 2317.05 required them to show that the statements in the article (1) were not made maliciously, and (2) were impartial. Rather, it found that under either of the applicable privileges, the statements need only have been "substantially accurate"—motive and subjective intent are immaterial. Having reviewed the allegations of the Jane Doe families' complaints in detail, the court concluded that the August 15, 2021 article accurately characterized the allegations in their complaint as claiming that Jacobs "mishandled" the investigation.

{¶ 17} Jacobs appealed. He assigns the following error for our review:

> The Trial Court erred by granting summary judgment when there were material facts in dispute.

## II. Law and Analysis

{¶ 18} In his sole assignment of error, Jacobs challenges the trial court's decision to grant summary judgment in favor of the defendants. Jacobs concedes that there is no evidence that the statements in the August 15, 2021 article were published maliciously. However, he maintains that to avail themselves of the privilege set forth in R.C. 2317.05, the defendants must show that the news story was both accurate and impartial. He insists that there is a question of fact preventing summary judgment because the newspaper agreed to withdraw the August 15, 2021 article as part of a settlement of another suit, which he claims may support an inference that the article was libelous. Finally, Jacobs disputes that the statements in the article constituted opinion.

7.

**{¶ 19}** The defendants challenge the admissibility of some of Jacobs's evidence. They maintain that the article is protected because it was a substantially accurate account of the allegations in the Jane Doe families' lawsuits, and they insist that only questions of law are presented here. The defendants further contend that their reporting was not malicious, was impartial, and contained statements of opinion.

## A. Standard of Review

**{¶ 20}** Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105 (1996), employing the same standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129 (9th Dist.1989). The motion may be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 67 (1978), Civ.R. 56(C).

**{¶ 21}** When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v.*

8.

*Montgomery*, 11 Ohio St.3d 75, 79 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### B. Jacobs's Motion to Supplement and Other Evidentiary Issues

{¶ 22} In opposing the motion for summary judgment, Jacobs cited portions of Westerhold's deposition, but he did not attach to his opposition brief excerpts of the transcript of the deposition and did not file the deposition transcript itself. Jacobs asks that he be permitted to supplement the record with the transcript of the deposition of Matt Westerhold.

{¶ 23} Under Civ.R. 56(C), the following materials may be considered on a motion for summary judgment: the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence and written stipulations of fact. "Other types of documents may be introduced as evidentiary material only through incorporation by reference in a properly framed affidavit." *Zapata Real Estate, L.L.C. v. Monty Realty, Ltd.,* 2014-Ohio-5550, ¶ 25 (8th Dist.), citing *Dzambasow v. Abakumov,* 2005-Ohio-6719, ¶ 26 (8th Dist.), citing *Lance Acceptance Corp. v. Claudio,* 2003-Ohio-3503 (9th Dist.). "Documents submitted in opposition to a motion for summary judgment which are not sworn, certified, or authenticated by affidavit have no evidentiary

9.

value and may not be considered by the court in deciding whether a genuine issue of material fact remains for trial." (Internal quotations and citations omitted.) *Id.*

{¶ 24} "Before a deposition transcript can be considered as 'legally acceptable evidence for summary judgment purposes': (1) the transcript must be filed with the court or otherwise authenticated; (2) the deponent must sign the deposition transcript or waive signature[;] and (3) there must be a certification by the court reporter before whom the deposition was taken." *Id.,* quoting *Bank of New York Mellon Tr. Co., v. Unger,* 2012-Ohio-1950, ¶ 43 (8th Dist.). A deposition that has not been filed with the court cannot be considered on summary judgment. *Sabol v. Richmond Hts. Gen. Hosp.,* 111 Ohio App.3d 598, 604, (8th Dist. 1996).

{¶ 25} Appellate review of a trial court's order is limited to the record made in the trial court. *Fifth Third Bank v. Fin. S. Office Partners, Ltd.*, 2010-Ohio-5638, *3 (2d Dist.), citing *Durrstein v. Durrstein*, 2001 WL 1203014 (2d Dist. Oct. 12, 2001). The record that we can consider is "the record as it existed at the time the trial court rendered judgment." *Leiby v. Univ. of Akron,* 2006-Ohio-2831, ¶ 7 (10th Dist.), citing *Chickey v. Watts,* 2005-Ohio-4974, ¶ 14 (10th Dist.); *Baker v. Senior Emergency Home Repair EOPA*, 2015-Ohio-3083, ¶ 11 (6th Dist.), quoting *State v. Ishmail,* 54 Ohio St.2d 402 (1978), paragraph one of the syllabus ("Ohio law is clear that we must limit our review on appeal to the record before the court at the time of judgment: 'A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings and then decide the appeal on the basis of the new matter.'").

10.

{¶ 26} Here, we deny Jacobs's motion to supplement the record with Westerhold's deposition transcript because that deposition was not filed in the trial court and there is no evidence that the trial court considered it.  In fact, the trial court issued a 20-page judgment granting summary judgment to defendants—including 13 pages of factual background—but did not cite Westerhold's deposition at all.  Moreover, we decline to consider any of the exhibits that were attached to the deposition transcript—other than the August 15, 2021 article, which defendants attached to their answer and the trial court clearly reviewed and considered—because they were not filed in the trial court and were not properly authenticated.

### C.  Our De Novo Review

{¶ 27} Having denied Jacobs's motion to supplement the record with the transcript of Westerhold's deposition, and having made clear that the exhibits to that deposition will not be considered (except the August 15, 2021 article), we now consider the merits of Jacobs's appeal.

{¶ 28} To prevail on a claim of defamation against a news organization, a plaintiff must show "(1) the organization made a false statement, (2) the statement was defamatory, (3) the organization published the statement, (4) the plaintiff was harmed as a proximate result of the publication, and (5) the organization acted with the requisite degree of fault in publishing the statement." *Anderson v. WBNS-TV*, *Inc.*, 2019-Ohio-5196, ¶ 9, citing *Am. Chem. Soc. v. Leadscope*, *Inc.*, 2012-Ohio-4193, ¶ 77.  A news

11.

organization may be protected against liability, however, under the statutory privilege set forth in R.C. 2317.05.

{¶ 29} R.C. 2317.05 provides, in pertinent part, as follows:

> The publication of a fair and impartial report of . . . the filing of any affidavit, pleading, or other document in any . . . civil cause . . ., or of a fair and impartial report of the contents thereof, is privileged, unless it is proved that the same was published maliciously, or that the defendant has refused or neglected to publish in the same manner in which the publication complained of appeared, a reasonable written explanation or contradiction thereof by the plaintiff, or that the publisher has refused, upon request of the plaintiff, to publish the subsequent determination of such suit or action. . . .

{¶ 30} In *Oney v. Allen,* 39 Ohio St.3d 103, 105-106 (1988), the Ohio Supreme Court determined that a report is "impartial" if it is unbiased and does not give the impression that the writer agrees or disagrees with the assertions contained in the official record. It explained that to fall within the privilege of R.C. 2317.05, the defendant must show that "the publication is a substantially accurate report of the official record." *Id.* at paragraph two of the syllabus. The Court clarified that a report is "substantially accurate if it conveys the essence of the official record to the ordinary reader, without misleading the reader by the inclusion of inaccurate extra-record information or the exclusion of relevant information in the record." *Id.,* at paragraph three of the syllabus. Importantly, the Court found that R.C. 2317.05 does not require the report to be a verbatim reproduction of the official record. *Id.* at paragraph one of the syllabus. It is sufficient if the "gravamen," "gist," or "substance" is substantially correct. *Id.* at 106.

12.

**{¶ 31}** Here, the allegedly defamatory statement was contained in the August 15, 2021 article and was made in the context of reporting the crux of the lawsuits filed in federal court by the Jane Doe families. Where the content of allegedly defamatory statements and the circumstances of their communication are not disputed, the determination of whether the allegedly defamatory statement is subject to privilege is a question of law to be reviewed de novo. *Anderson v. WBNS-TV, Inc.,* 2024-Ohio-4880, ¶ 35 (10th Dist.). Here, the content and circumstances of the allegedly defamatory statements are not disputed, thus the applicability of the privilege may be determined as a matter of law.

**{¶ 32}** The article at issue reported as follows:

**Residents want answers**

Matt Westerhold
Aug 15, 2021 2:00 PM

HURON  Huron's school board will consider an agenda item that has some community members fighting back.

On Tuesday, board members will consider making Matthew A. Jacobs the head wrestling coach, renewing his contract. Jacobs, a part-time employee of the district, is a full-time Huron police detective.

Normally a routine agenda item that would not get much attention, this appointment has drawn the ire of some residents because *the district is fighting a lawsuit that alleges Jacobs, in his role as a police detective, mishandled an investigation at McCormick Junior High School in 2019.*

Two students, both 13 at the time, contend they were subjected to sexual misconduct by a third student, also 13, and the district failed to protect them from further abuse after the boy was suspended and later returned to school.

13.

The boy is a student-athlete and was coached by Jacobs. Jacobs told families he was personal friends with the boy's parents, according to a lawsuit in Erie County Common Pleas Court against the school district, school board members, administrators and Jacobs, which also contends the detective told the victims' families to destroy obscene photos and videos the boy sent the girls or they could be charged with a crime.

**Nothing to see here**

Huron police Chief Bob Lippert has defended the investigation Jacobs conducted and said it resulted in the boy being charged with a felony-level crime, for which he pleaded out in juvenile court. Lippert said recently he has not investigated *the allegations Jacobs mishandled the investigation* because no formal complaint was filed with the police department.

But Lippert has recently received complaints

"If there has not been a review or investigation at all, I am asking, why not?" Kelly Netherland, whose family is from Huron, wrote to Lippert on Aug. 4. "I urge you to you (sic) reconsider."

Netherland said people want answers.

"Huron is a great community. Quiet and peaceful in major part because of your department. With that said, I hope you can understand why the community is not willing to be quiet on this."

Lippert said last week he would consider handing over any further investigations of the McCormick School incident to an independent agency because of the appearance of conflicts. It is unclear where that stands presently.

**Keeping kids safe**

In a letter to the editor on Page A4 of Monday's newspaper, a district resident questions the school board's wisdom in selecting Jacobs for the coaching job with so many unanswered questions about the McCormick school incident.

District officials are accused in the lawsuit of seating one of the victims next to the boy who allegedly assaulted her in most, if not all, of her classes after the boy returned to school from being suspended in the spring of 2019.

They did not switch out seats after she complained, and the girl was subjected to bullying and verbal and physical taunts, according to the lawsuit, until she and the other victim both withdrew from the district.

The board owes the community a full accounting according to Erin Percy.

(Emphasis added.) The italicized phrases are at issue here, where the defendants characterize the complaints as having alleged that Jacobs "mishandled" the investigation.

{¶ 33} Certified copies of the Jane Doe families' lawsuits were included as exhibits to the defendants' motion for summary judgment. Jacobs was named as a defendant in both lawsuits. With respect to Jacobs's conduct, the complaint filed by Jane Doe 1's family alleged as follows:

- Jacobs was a detective of the Huron Police Department, an employee of the school district, and John Doe's wrestling coach;

- Jane Doe 1's family contacted Jacobs regarding graphic pictures and videos that were sent to multiple girls at the junior high school;

- Jacobs said that he would "interview everyone";

- Jacobs recommended that they delete the pictures/videos because they could be charged with child pornography if they were discovered before a report was filed;

- Jacobs said that John Doe is a "'jackass and he always tries to act as the class clown'";

15.

- Jacobs said that he "knew John Doe personally, since he was his wrestling coach at Huron City Schools and was a close family friend of John Doe's parents";

- Jacobs said that "during wrestling season, he would tell the wrestling team not to send these types of pictures, but he said that he was not surprised they kept doing it because that is how kids 'date' nowadays";

- Jacobs talked to students "who confirmed witnessing these same events and other similar acts by John Doe," including instances where he showed other students "pictures of his penis on his phone while at school and took a picture up another female student[']s skirt";

- "Jacobs was told that [the] parents [of another girl who received lewd pictures from John Doe] wanted to be called when they interviewed her because she had anxiety issues," but he did not do so;

- Jacobs was provided with photographic evidence of pictures John Doe sent to Jane Doe 2;

- "Jacobs interviewed John Doe a week after everyone else because John Doe already had a lawyer, but there are no details of these questions or answers in the police report produced by Detective Jacobs, despite having a detailed outline of every other witness' responses";

- "Jacobs never excused himself from the investigation due to a conflict of interest";

- "Jacobs indicated that he would write up a report and send it to the Erie County Prosecutor";

- "Jacobs, through this investigation, was provided a phone from Jane Doe [2] to download the photographic evidence that [she] and her family had shared with Detective Jacobs";

- Jane Doe 1's family "attempted to contact Detective Jacobs regarding charges against John Doe and was informed that once he was done with his report he would turn it over to the Prosecutor to determine what to do";

- "Prosecutor Goodman indicated that she never received any report from Detective Jacobs and had no idea who they were";

- "Jacobs told [Jane Doe 1's father] that he had found no more incriminating evidence on Jane Doe [2]'s phone and that this 'does not make Jane Doe [2] look good,' insinuating that she was fabricating everything despite several male and female students witnessing this ongoing harassment as well as Detective Jacobs personally viewing lewd photos on both Jane Doe [2]'s phone and John Doe's phone";

- "Jacobs never sent any pictures or videos to [Prosecutor Goodrum], but instead kept all of the evidence hidden and/or destroyed the evidence"; and

- "John Doe was arrested on the charges related to sending pictures of his genitals to [Jane Doe 1] and other victims," "was charged with two counts of pandering and two counts of public indecency," and "pleaded guilty to one count of pandering obscenity involving a minor."

{¶ 34} The complaint filed by Jane Doe 2's family included similar allegations:

- Jacobs was the "investigating officer throughout the entire investigation," was an employee of the Huron City School District, and served as John Doe's wrestling coach;

- Jacobs "recommended that [Jane Doe 1's family] should delete any pictures/videos John Doe sent their daughter" and informed them to tell Jane Doe 2's family "to either call him or delete the pictures/videos";

- "Jacobs explained that both families could all be charged with child pornography if the pictures or items were discovered or reported before the families filed a report";

- The family met with Jacobs at the Huron Police Department;

- The family told Jacobs "everything that had happened with the inappropriate pictures";

- Jacobs told the family "that he knew John Doe well and was not surprised that John Doe was committing these offensive acts";

- Jacobs said "that he told the wrestling team not to send these pictures, but he said they kept doing it because that is how kids 'date' nowadays";

- The family left their daughter's cell phone with Jacobs "so he could download the inappropriate pictures and videos with the intent that the evidence would be used to prosecute John Doe";

- Jacobs never sent the evidence to the Erie County Prosecutor's office and instead "kept the evidence to himself and made false statements regarding the content of [Jane Doe 2's] phone to third parties in order to disparage Jane Doe 2] and shield John Doe from consequences";

- "Jacobs saw the photos of John Doe, sent by him to [Jane Doe 2] on [her] phone";

- The family "noted that the pictures and videos were deleted off [Jane Doe 2's] phone," and Jacobs "held the only proof of the illegal misconduct by John Doe";

- Jacobs told the family "that he would make a report and submit it to the Erie County Prosecutor's Office," but "he failed to send the evidence of the wrongdoing along with the report";

- Jacobs told the family that he could not interview John Doe because his parents had hired an attorney;

- The principal told the family that "Jacobs conducted an interview with John Doe over Spring Break," but the principal was not invited to that interview;

- Jane Doe 2's mother called the prosecutor's office and informed Jacobs that John Doe assaulted Jane Doe 2 in the locker room;

- The prosecutor informed the family that Jacobs "never sent her the pictures and videos from [Jane Doe 2's] phone"; and

- Jane Doe 2 observed Jacobs "pat John Doe's back and say, 'it's okay buddy...we got this,'" sending the message that he would "ensure that John Doe would be shielded from any significant consequences."

{¶ 35} In sum, the families alleged in their complaints that Jacobs protected John Doe because he was a family friend and athlete, investigated the girls' claims despite having a conflict of interest, encouraged the families to delete evidence supporting their

18.

daughters' accusations, and hid, destroyed, or failed to turn over evidence to the prosecutor. As a matter of law, we find that the defendants fairly and accurately summarized the complaints as alleging that Jacobs "mishandled" the investigation here. The defendants accurately characterized and reported the "gist" of the underlying complaints.

{¶ 36} Despite Jacobs's suggestion to the contrary, the defendants were not obligated to confirm the accuracy of the Jane Doe families' allegations before reporting about them. *See Sethi v. WFMJ Television, Inc.,* 134 Ohio App.3d 796, 811 (7th Dist. 1999) ("Appellants' contention regarding the failure to conduct further investigation in this matter and obtain an expert medical review prior to broadcast is without merit as appellees had no such duty."); *Smitek v. Lorain Cnty. Printing & Publishing Co.*, 1995 WL 599036, *4 (9th Dist. Oct. 11, 1995) (rejecting the claim that newspaper was required to independently investigate the accuracy of the contents of the official record about which it reported). And although Jacobs claims that the defendants made a "flat factual statement" that Jacobs mishandled the investigation, a simple review of the article confirms that they reported that these were allegations contained in the *Jane Doe families' complaints*.

{¶ 37} Jacobs insists that the defendants lacked impartiality in their reporting, as evidenced by an editorial advocating that "Me Too" signs should be hung in the classrooms at the school. But the only article that was properly made part of the record here was the August 15, 2021 article, which made no mention of a "Me Too" campaign.

19.

Additionally, Jacobs contends that the defendants ultimately withdrew the article from their website. However, the record is devoid of summary-judgment quality evidence demonstrating that (or why) the article was withdrawn. What's more, this fact has no bearing on whether the privilege in R.C. 2317.05 applies here.

{¶ 38} For these reasons, we find that the trial court did not err when it found that the statements were protected by the privilege set forth in R.C. 2317.05, and we find no error in its decision granting summary judgment in favor of the defendants. We find Jacobs's sole assignment of error not well-taken.

### III.  Conclusion

{¶ 39} As a matter of law, statements made in the defendants' August 15, 2021 article that the Jane Doe families alleged that Jacobs "mishandled the investigation" were impartial and were substantially accurate. The trial court properly granted summary judgment in favor of the defendants. We find Jacobs's assignment of error not well-taken.

{¶ 40} We deny Jacobs's motion to supplement the record.

{¶ 41} We affirm the January 2, 2024 judgment of the Erie County Court of Common Pleas. Jacobs is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.              _____
                                  JUDGE

Myron C. Duhart, J.


Charles E. Sulek, P.J.              _____
CONCUR.                                   JUDGE


                              _____
                                    JUDGE


This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.